OPINION OF THE COURT
Howard Spitz, J.
*878 With the enactment of chapter 85 of the Laws of 1996, the court is now mandated to factor "domestic violence” into a custody determination, but the statute is silent as to its exact definition. However, a careful reading of it shows that domestic violence is not limited to overt acts of violence which cause physical injury. The Legislature implicitly recognized that domestic violence is not a static concept, when it stated in section 1 of chapter 85 of the Laws of 1996 that: "A home environment of constant fear where physical or psychological violence is the means of control and the norm for the resolution of disputes must be contrary to the best interests of a child.” (Emphasis added.) Indeed, whether an abuser physically injures his victim, or whether an abuser engages in psychological assault, the wounds are deep, long-lasting and far-reaching.
On March 12, 1996, J. D. (hereinafter referred to as the Petitioner or the Father) filed a petition in this court seeking custody of his son, S. R. D., the subject child, born December 30, 1993. Petitioner alleged, inter alia, that his wife, N. D., left the marital residence with their son on February 27, 1996, and had not contacted him since. By order to show cause dated April 15, 1996, the Petitioner was awarded temporary custody based upon the grounds that he located his son outside the State of New York and that his wife intended to go "underground”.
On May 5, 1996, N. D. (hereinafter referred to as the Respondent or the Mother) filed a petition in this court seeking sole custody of the subject child. She alleged, inter alia, that she was forced to leave her home fearing for the safety of herself and her son. She further alleged that the Petitioner was an alcoholic and had physically and verbally abused her.
At all relevant stages of the proceeding, Petitioner was represented by retained counsel and Respondent was represented by court-assigned counsel. The child was represented by a court-appointed Law Guardian. The fact-finding hearing commenced on July 18, 1996, and continued on several days thereafter, finally concluding on October 4, 1996. The Probation Department conducted home studies, and clinical evaluations of the parties were performed. Each party testified and also proffered witnesses consisting of friends and family attesting to their respective character.
The parties met in February 1985, started living together in May 1985, and married in December 1987. The subject child was born on December 30, 1993. The entire relationship has been a stormy one, marked mostly by a power and control *879 struggle, abuse, periods of group sex and the use of marihuana and alcohol. The Respondent stated that the Petitioner is a very heavy drinker and has been intoxicated on many occasions. He also operates a motor vehicle without a proper license. He made her use marihuana during the early years of their marriage and forced her to have group sex both prior to and during their marriage. He took pictures of her during these trysts and some of the pictures were introduced into evidence by Petitioner.
The Respondent testified that the Petitioner continuously insulted her and threatened her verbally using such words and phrases as "cunt”, "lazy bitch”, "if you ask for a divorce, I will kill you first”, "when the hell is dinner”, "he’s your son, take care of him”. On April 15, 1995, the police were called when the Petitioner hit her on the head with a stuffed animal; no charges were filed. The Respondent further testified that Petitioner threw her against the wall on several occasions and that he also threw a beer bottle which missed her, but broke a window. She stated that he continually shoved a fist in front of her face, threatening, but never striking her. She slept with a knife under her pillow fearing for her safety and that of the child. Finally on February 27, 1996, she left the marital residence and fled to a shelter in Manhattan. She stated that prior to her departure, the Petitioner had threatened her with a knife and told her that if she left, he would kill her.
On March 6, 1996, while living at a Manhattan shelter, the Respondent filed a family offense petition against the Petitioner. She obtained a temporary order of protection, which, inter alia, ordered the Petitioner to stay away from her and the child. She. had the order modified on April 21, 1996, to include her place of employment as well. The case was later transferred to this court, which conducted a hearing and sustained the petition.
While at the shelter, Respondent was contacted by a Mr. D. who represented that he was associated with a women’s rights group. She was given money and board and moved to a Holiday Inn in Connecticut, allegedly upon Mr. D.’s arrangements. It was ascertained at the hearing that Mr. D. had been retained by the Petitioner as an investigator. Several days later, the police arrived at the premises where Respondent was located. She later surrendered the child to the Petitioner based upon the aforesaid temporary order of custody issued by this court. Respondent thereafter filed a custody petition on May 5, 1996. Respondent, when confronted with the question of her remain *880 ing so long with the Petitioner and why she didn’t tell anyone about her plight, replied that she was stupid, afraid and embarrassed about her personal life. She also stated that the Petitioner stripped her of everything as a person.
The Petitioner testified that he is a 20-year employee of the C. C. B. C., holds a responsible position, and does not have a drinking problem. He denied the charges of verbal and other abuse. He maintains that he is a dutiful and caring father who is managing things quite well. He admitted having problems with the Department of Motor Vehicles with regard to speeding violations and with his license. He accused the Respondent of going underground with his son and was fearful that she would disappear. He claims to know nothing of the circumstances involving the move from the Manhattan shelter to Connecticut, or the name of the investigator, although he acknowledges speaking to him many times during this period. Petitioner admitted seeing a Dr. R. about his drinking problem in February 1995. The doctor’s medical report, which was admitted into evidence, indicated that the Petitioner drank on a daily basis a six pack of beer, as well as one-half pint of rum. He denied this by stating that the most he consumed were two beers at dinner and a shot of scotch or tequila after dinner.
K. F.-D., a certified alcohol counselor from the M. Institute, testified that based upon her two assessment visits with the Petitioner, he definitely abuses alcohol, but is not classified as drug dependent. This abuse is characterized by blackouts, increased tolerance for alcohol, difficulty reducing or abstaining from alcohol use, and denial that his alcohol use is out of control or excessive. She opined that such abuse could be damaging to the rearing of a child.
Dr. H. L., a court-appointed psychiatrist who interviewed the parties on two occasions, testified that due to the disparities between presentations of the parties, he could make no recommendation as to custody. He thought more clarity could be evinced through court proceedings and testimony. However, he expressed concern with the Petitioner’s elevated liver function tests which could indicate alcohol abuse. He was also concerned with his driving record and indicated that operating a motor vehicle without a valid license would present a safety hazard to the child. He also thought that there may be some truth to the Respondent’s allegations that she was helpless in dealing with a coercive, forceful and possibly abusive person, who may well have abused alcohol.
It is clear that between two natural parents, the preeminent concern in a custody determination is what is in the best *881 interests of the child. (Eschbach v Eschbach, 56 NY2d 167; Friederwitzer v Friederwitzer, 55 NY2d 89.) Courts making custody determinations must weigh several factors of varying degrees of importance including but not limited to the relative fitness of the parties, quality of home environment, existence of siblings, parents’ financial status, parental guidance and their ability to provide for the child’s emotional and intellectual functioning. (Eschbach v Eschbach, supra; Friederwitzer v Friederwitzer, supra.) In addition to the case law factors set forth above, the court, as previously stated herein, is now also mandated by statute to consider the impact of domestic violence on the child in custody /visitation proceedings. (See, L 1996, ch 85, eff May 21, 1996.) The legislative policy as set forth in section 1 of the Act (L 1996, ch 85) states: "Rather than imposing a presumption, the legislature hereby establishes domestic violence as a factor for the court to consider in child custody and visitation proceedings, regardless of whether the child has witnessed or has been a direct victim of the violence.” Each custody case must be decided on its own particular facts and with due consideration given to each and every relevant factor. (See, Matter of Pasco v Nolen, 154 AD2d 774.) The court has observed the parties over many days and has carefully assessed their credibility and demeanor as well as that of their witnesses.
The evidence clearly indicates that the Petitioner abuses alcohol despite his protestations to the contrary. Dr. R. mentions in his medical report the huge amount of alcohol consumed by the Petitioner on a daily basis. K. F.-D., the certified alcohol counselor, stated with certainty that there was alcohol abuse. Dr. L. was very concerned about the elevated liver tests. Both he and Ms. D. testified that such abuse could be damaging and detrimental to the rearing of a child.
Dr. L. was also concerned with the fact that the Petitioner might have been operating a motor vehicle without a valid license and that the safety of the child could very well be compromised, if Petitioner continued with this irresponsible behavior. The evidence adduced at the hearing confirmed the fact that the Petitioner was indeed driving an automobile without a valid license. In fact, during the course of the proceeding, the court issued an order forbidding the child to ride in a motor vehicle with Petitioner unless that vehicle was operated by a licensed driver.
The court has listened carefully to the testimony of the parties and their witnesses and has read and reviewed the *882 exhibits. Compelling proof of an unmistakable pattern of power and control exerted by the Petitioner against the Respondent emerged at this trial. Economic, verbal and sexual abuse, coupled with regular and frequent threats and intimidation, while more subtle in nature, are no less damaging than a physical blow. This panoply of factors is omnipresent in the case at bar. When taken together, they form the profile of a Respondent whose body may appear intact, but whose spirit has been pummeled and eroded by her husband’s verbal aggression and psychological terror. They also help to explain many of her actions during their relationship.
While Petitioner tried to show that Respondent was a loner with no friends, he failed to explain how she came to be that way. No extended analysis is needed to conclude that Respondent significantly withdrew from the outside world as a direct result of Petitioner’s dominance over every aspect of her life. Petitioner turned Respondent into a virtual prisoner by his own acts, and is now seeking to blame her for it. At this juncture it is necessary to explore the components of domestic violence present herein by detailing the types of abuse perpetrated by Petitioner.
The verbal abuse consisted of Petitioner regularly denigrating Respondent and diminishing her self-esteem and mental stability with comments like "lazy bitch”, "cunt”, and "worthless”, as well as telling her she was fat and crazy. He also told her how to dress, and insulted her about reading the Bible and going to church.
The sexual abuse came about in the form of Petitioner forcing her to engage in group sex, while he personally took pictures of the events. When the Respondent tore up some of the pictures, the Petitioner then pasted them back together. Respondent also alleged that Petitioner tried to rape her three times and that she kept a knife under her pillow. She stated that "if he did it, I would kill him”.
The use of threats were common in this relationship. The Petitioner would continually put his fist up to the Respondent’s nose in a menacing manner without actually hitting her. He used verbal death threats to the effect that "I’ll kill you before I give you a divorce”, or "I’ll pay someone to kill you”. He intimidated her by threatening to falsely report to the authorities that she molested her child. He also overturned furniture on several occasions and threw food on the floor when angry. The Respondent stated that she feared he would kill her whenever he came home at night especially in an intoxicated condition.
*883 According to Respondent, Petitioner also engaged in economic abuse by taking her money and controlling all finances, thereby making Respondent totally financially dependent upon him. For example, when Respondent was employed, Petitioner forced her to surrender her paycheck to him. When she was not employed, Respondent was compelled to ask Petitioner for money. Petitioner would then decide whether or not to grant Respondent’s request.
There was also physical abuse, albeit to a lesser extent. It took the form of the Petitioner throwing and striking the Respondent with a stuffed animal at or about her head and face, throwing her against the wall on several occasions, threatening her with a knife and throwing a beer can at her.
The entire pattern of power and control was so pervasive in this relationship that it instilled in Respondent fear, despair, embarrassment, inadequacy and humiliation. She finally gathered enough courage to ultimately flee the home and enter a Manhattan shelter for her own safety as well as that of her child.
The Respondent’s subsequent actions directly refute Petitioner’s claims that she was going underground. Respondent utilized the judicial process by staying in the shelter and filing a family offense petition. She secured a temporary order of protection against the Petitioner in New York County Family Court on March 6, 1996, with conditions that Petitioner stay away from her and the child and that he not harass, threaten or assault them. She returned to Family Court on April 2, 1996 to amend the order to include her place of employment, in the event she obtained a job. There was no evidence to show that she was fleeing the Petitioner for purposes of going underground as he alleged in his custody petition.
"What is most alarming is that Petitioner extended his power and control over Respondent even after she sought refuge in a women’s shelter. Respondent’s relocation to Connecticut was done at the behest of Mr. D. who told her he was from a women’s rights group, gave her money and paid for the lodging to remain in that State for a few days. However, Mr. D. was actually employed by the Petitioner as an investigator. It was through this investigator that Petitioner learned of Respondent’s and the child’s whereabouts. The police were called and the child was released to the Petitioner upon his showing them the temporary order of custody. It is understandable why the Respondent left the Manhattan shelter at the beckoning of the investigator. Unbeknownst to her, she was being manipulated *884 at a distance by the Petitioner via his hiring of Mr. D. She was so vulnerable at that moment that she placed her trust in someone who would ultimately deceive her — someone who was acting as an agent for the Petitioner. This court notes that at no time did Petitioner proffer any evidence to refute Respondent’s version of these events concerning Mr. D. and never called him as a witness.
In the case at bar, both parents are able to provide for the child’s physical and material needs. However, a parent’s duty involves much more than just clothing, feeding and sheltering a child. The overwhelming evidence of psychological and other forms of abuse inflicted by Petitioner upon the Respondent, the mother of his child, shows that it would not be in the child’s best interests to place him in Petitioner’s care and custody. In addition, Petitioner, unlike the Respondent, did not show that he had any extended family to help him care for the child. While he mentioned his mother, she resides in Puerto Rico, and any claim that she will relocate here is speculative at best. The Respondent Mother has always cared for the child, and there was no evidence to show that she is in any way unfit to continue to care for him.
Petitioner, on the other hand, abuses liquor, and has admittedly violated the law by driving without a license. Moreover, he has attempted to manipulate the court by deceiving it on at least one occasion when, in seeking temporary custody, he stated that he did not know the whereabouts of his wife or child. In reality, he knew exactly where they were, because his investigator placed them there. As the Law Guardian aptly stated while recommending custody to the Mother, the methods employed by the Father to obtain his child involved chicanery and deception and should not go unnoticed. Indeed, it has not. In this court’s view, Respondent’s ability to provide for the moral, religious, intellectual and over-all development of the subject child is far superior to that of Petitioner. It is clearly in the child’s best interests to grant sole custody to the Respondent Mother.
Accordingly, Petitioner’s petition is denied. Respondent’s petition for custody is granted.