OPINION OF THE COURT
Mary E. Bednar, J.
I
Before the court are cross petitions for custody of Leonard *390 Blue, Jr., filed by his father, Leonard Blue, Sr., and by Inell Peters, a nonrelative who is the child’s present caretaker.
Because Ms. Peters has alleged that there are extraordinary circumstances warranting denial of Mr. Blue’s petition for custody of his son, a hearing upon that issue was conducted before me on January 21, 1997 and February 27, 1997.
Based upon the testimony of the witnesses and the documentary evidence introduced at the hearing, I make the following findings of fact and conclusions of law.
Leonard Blue, Jr. (the child), was born out of wedlock to Leonard Blue, Sr. and Diana Jones on February 17, 1990. Subsequent to the child’s birth, Mr. Blue and Ms. Jones were married on May 7, 1990. Although the exact period of time during which Mr. Blue and Ms. Jones lived together prior to the child’s birth is not clear, they did reside together at 1309 Fifth Avenue, apartment 29G, in New York County, from May 7, 1990 until Mr. Blue was arrested on December 8, 1990. There is no indication that Mr. Blue and Ms. Jones resided together after December 8, 1990.
Mr. Blue and Ms. Jones clearly had a turbulent relationship although, because Ms. Jones died on October 2, 1996, the exact nature of their relationship is difficult to discern. What is clear, however, is that on no less than three occasions Mr. Blue admits that he struck his wife in her face while they resided in the same household. Mr. Blue stated that he struck Ms. Jones "with an open hand”. Inell Peters, who is presently caring for the child at the request of his late mother, knew Ms. Jones for 21 years. She formerly resided at 1309 Fifth Avenue, apartment 4D, in New York County, and during the majority of these years, she saw Ms. Jones "every day”. Ms. Peters recalls an incident which occurred when the child was less than one year old while Mr. Blue and Ms. Jones were residing together. According to Ms. Peters, one evening Ms. Jones came to her apartment and she was bleeding "[flrom her head, over her right eye * * * [s]he was crying and standing there asking me to help her please”. Ms. Jones asked her to call the police, which she did, and she then went up to the 19th floor to get the child from Mr. Blue to bring him to Ms. Jones. Ms. Peters testified that Mr. Blue and Ms. Jones "were fighting all of the time” and she recalls that she would see Ms. Jones with "black eyes and busted lip”, and that she would tell her that Mr. Blue "did it”.
The turbulent relationship between Mr. Blue and Ms. Jones was confirmed by the testimony of Mr. Blue’s sisters, Ms. *391 Martin-Burrow and Ms. Blue, and by the testimony of Mr. Blue himself. According to Mr. Blue, he never struck Ms. Jones with a closed fist and denies that he ever physically injured her or that he ever struck Ms. Jones while the child was present. Additionally, Mr. Blue stated that the 1990 incident which resulted in Ms. Jones fleeing to Ms. Peters’ apartment was precipitated by an argument he had with his wife about her smoking of angel dust. However, none of the other witnesses testified to any drug use by Ms. Jones, and I note that Mr. Blue admits to prior use of cocaine, and that he has been convicted of drug offenses in the past.
On June 19, 1990, Ms. Jones obtained a temporary order of protection against Mr. Blue from the New York County Criminal Court, and that order was further extended by the Criminal Court. On December 8, 1990, Mr. Blue was arrested for an incident involving Ms. Jones, and on July 2, 1991, Mr. Blue entered a plea of guilty to the crime of criminal contempt in the second degree arising out of his violation of the temporary order of protection, as well as another crime, and to a violation of his parole. As a result of this conviction, Mr. Blue was sentenced to a term of incarceration of six months, and the Criminal Court issued a final order of protection to Ms. Jones for a period of three years (see, CPL 530.12 [5] [ii]).
Mr. Blue, who was 34 years old at the time of the hearing, has been convicted of three felonies and two misdemeanors subsequent to the birth of the child. While the felony convictions did not involve Ms. Jones, the periods of imprisonment which were imposed resulted in Mr. Blue’s prolonged separation from the child, although he testified, incongruously, that he lived with the child during the first two years of his life. In fact, Mr. Blue was incarcerated from December 1990 until July 1991 in connection with his misdemeanor convictions, as well as from January 1993 until March 1996 in connection with a conviction for criminal possession of a controlled substance in the fifth degree.
Although Mr. Blue testified to a close relationship with the child, his contact with him between the time he separated from Ms. Jones until his most recent incarceration in 1993 was sporadic. During his most recent incarceration, between 1993 and 1996, Mr. Blue did not see his son, nor did he telephone him at Ms. Jones’ residence. He did however speak to the child on those occasions when he called the child’s paternal grandmother and the child was visiting there. He did not ask any member of his family to bring the child to visit him in *392 prison. In March 1996, Mr. Blue was released from prison, and he was paroled on May 5, 1996. Since his parole, he has resided in Albany, New York, with his fiancé, Fajur Shabazz. Ms. Shabazz, who has known Mr. Blue for six years, has only seen the child with his father on three or four occasions between 1995 and 1997. In fact, according to Shabazz, prior to summer 1996, she had only seen the child "once or twice”. Neither Mr. Blue’s mother nor his sisters testified to any regular contact between the child and his father between December 1990 and April 1997. According to Ms. Peters, who assumed care of the child at the request of Ms. Jones, and who has since moved to Virginia with him, there is no relationship between Mr. Blue and the child, and the child "doesn’t want to see” his father. While Mr. Blue stated that he believed that Ms. Jones had impeded his relationship with the child while he was incarcerated, he also stated that Ms. Jones would send him letters which contained notes or drawings made by the child. Since his parole in May 1996, Mr. Blue states that he has visited his son seven or eight times at the home of the paternal grandmother.
II
A custody proceeding between a parent and a nonparent is governed by the firmly established principle that the natural parent’s right to the custody of his or her child is superior to that of any other person, unless the parent is unfit or the parent has surrendered, abandoned, or persistently neglected the child (see, People ex rel. Kropp v Shepsky, 305 NY 465, 468; Matter of Bennett v Jeffreys, 40 NY2d 543, 548-549; Matter of Male Infant L., 61 NY2d 420, 426-427; Matter of Ronald FF. v Cindy GG., 70 NY2d 141, 144; Matter of Michael B., 80 NY2d 299, 309).[1]
It is only where a court determines that there are extraordinary circumstances, such as parental unfitness, surrender, abandonment, or persistent neglect, that there may then be an inquiry into the child’s best interests (see, Matter of Male Infant L., 61 NY2d, at 427, supra; Matter of Ronald FF. v Cindy GG., 70 NY2d, at 144, supra; Matter of Lake v Van Wormer, 216 AD2d 735). The burden of establishing the existence of extraordinary circumstances is upon the party seeking to *393 deprive the natural parent of custody (see, Matter of Katherine D. v Christine D., 187 AD2d 587, 588; People ex rel. Zayas v Rudish, 194 AD2d 577; Matter of Commissioner of Social Servs. of City of N. Y. [Tyrique P.], 216 AD2d 387).
In this case, there is sufficient evidence establishing extraordinary circumstances, thereby warranting inquiry into the child’s best interests.
The child, Leonard Blue, Jr., has lived apart from his father for the majority of his life. Since the child’s birth on February 17, 1990, Mr. Blue has been incarcerated two times. On July 2, 1991, Mr. Blue was released after being sentenced for a misdemeanor conviction, having served more than six months in jail prior to sentence being imposed, and on January 7, 1993, he was sentenced to prison for a term of three to six years for a felony conviction. Thus, between February 17, 1990 and May 6, 1996, when he was paroled from his most recent incarceration, Mr. Blue has spent over three years in custody. Moreover, Mr. Blue testified that the child did not visit with him while he was imprisoned between 1993 and 1996, and there is no evidence that he lived with the child and his mother after December 1990.
Between July 1991 and his most recent incarceration in 1993, it is not clear how much contact Mr. Blue had with his son. During this time, the child was in the care and custody of his mother and his contact with the child appears to have been sporadic, at best. While Mr. Blue has had contact with the child since his release from prison in March 1996, that contact has been of limited duration because Mr. Blue is presently living in Albany, New York.
It has been recognized that an extended involuntary disruption of a parent’s custody of a child, when coupled with psychological bonding between the child and his or her caretaker, may constitute extraordinary circumstances, especially where there is a potential for emotional harm to the child were custody to be transferred to the parent (see, Matter of Kreslein v Hanley, 157 AD2d 659; Matter of Bisignano v Walz, 164 AD2d 317; Matter of Zamoiski v Centeno, 166 AD2d 781, lv denied 77 NY2d 803; Matter of Pauline G. v Carolyn F., 187 AD2d 589; Matter of Commissioner of Social Servs. of City of N. Y. [Tyrique P.], 216 AD2d 387, supra).
Here, there is proof of an extended separation between father and son, and there must be a hearing to determine the nature of the child’s relationship with his caretaker and whether the child would suffer harm were custody to be transferred to his father.
*394 Mr. Blue’s history of domestic violence which occurred during the period of time he resided with Ms. Jones presents further extraordinary circumstances. In addition to the 1991 convictions arising out of his assault upon Ms. Jones and his violation of the temporary order of protection, there is evidence that Mr. Blue often assaulted his wife, resulting in physical injury to her. While Mr. Blue has sought to minimize the severity of these incidents, he has not denied that they occurred.
The Legislature has directed that courts consider domestic violence as a relevant factor in any proceeding involving the custody of a child (see, Domestic Relations Law § 240 [1], as amended by L 1996, ch 85), and courts have recognized that domestic violence has a negative impact upon the well-being of children (see, Matter of E. R. v G. S. R., 170 Misc 2d 659; Matter of J.D.v N. D., 170 Misc 2d 877).
Indeed, repeated or serious acts of domestic violence or spousal abuse have been found to constitute neglect (see, Family Ct Act § 1012 [f] [i] [B]), because of the effect that the exposure to domestic violence has upon young children (see, Matter of Theresa CC., 178 AD2d 687; Matter of Tami G., 209 AD2d 869, lv denied 85 NY2d 804; Matter of Billy Jean II., 226 AD2d 767, 770; see also, Matter of Christina LL., 233 AD2d 705, lv denied 89 NY2d 812; In re Heather, 52 Cal App 4th 183, 60 Cal Rptr 2d 315 [1996]),[2] and it has been acknowledged that a parent who commits acts of domestic violence or spousal abuse is generally unfit to act as the custodian of his or her children (see, Matter of Acevedo v Acevedo, 200 AD2d 567, 568; Matter of Antionette M. v Paul Seth G., 202 AD2d 429; Matter of Rohan v Rohan, 213 AD2d 804, 806; Matter of Commissioner of Social Servs. of City of N. Y. [Tyrique P.], 216 AD2d 401, at 388, supra; see also, Matter of Irwin v Schmidt, 236 AD2d 401).
*395 Accordingly, based upon the evidence before me, I find that extraordinary circumstances exist and that a hearing is required to determine the best interests of this child.

. As Leonard, Jr.’s surviving parent, Mr. Blue is presumptively entitled to custody of the child (see, Domestic Relations Law § 81; Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 81, at 370-371).

. The Court of Appeal’s decision in In re Heather (supra), affirms the trial court’s finding that the children were dependent (i.e., "neglected”) children based upon a history of domestic violence in their home. Although there was no evidence that the children had been physically or emotionally abused, there was evidence that the children may have suffered "secondary abuse” by being exposed to violence perpetrated by their father upon their stepmother. In affirming the trial court, the Court of Appeal states that "[i]t is clear to this court that domestic violence in the same household where children are living is neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it” (supra, 52 Cal App 4th, at 194, 60 Cal Rptr 2d, at 321).