In the Matter of CARLTON CURRY, Appellant, v CHERYL ASHBY, Respondent.

First Department, July 16, 1987

## APPEARANCES OF COUNSEL

*David Gilman* for appellant.

*Paula Dladla* of counsel *(Eric Aglow* with her on the brief; *Gerald Mann,* attorney), for respondent.

**OPINION OF THE COURT**

Per Curiam.

In a dispute concerning the custody of a girl, 10 years old at the time of the hearing in the Family Court, between the girl's father and her mother's sister, with whom the girl and her younger brother had been living since the tragic death of the girl's mother, the father appeals from an order of the Family Court which concluded that the child's "best interests at this time would be served by her remaining in the care and custody of her maternal aunt, Cheryl Ashby, that there shall be allowed liberal visitation between the father and child, and that both petitioner and respondent are to fully cooperate in seeing that the relationship between the father and child continue to grow."

The facts in this case demonstrate with unusual clarity the difficult issue of policy presented where a parent with whom a child has not lived for a number of years seeks custody of the child under circumstances in which that quite normal desire can be accomplished only by removing the child against her wishes from a happy and positive family environment, and in which that removal presents a substantial possibility of significant emotional damage to the child.

The Family Court determined the issue on the basis of its judgment of the best interests of the child, a judgment which was in agreement with the opinions of expert witnesses, and which we believe to be strongly supported by the evidence. The Family Court did not address whether there were extraordinary circumstances which, under the rules of law governing custodial disputes between a parent and nonparent, must be found before the court may even consider the best interests of the child. The critical issue presented is whether the facts establish extraordinary circumstances in the absence of any culpable conduct on the part of the parent sufficient to justify consideration of the child's best interests. We believe that they do.

Sakina Frank was born on June 24, 1976. Her mother, Sandra Frank, was 14 at the time, and her father, the petitioner, Carlton Curry, was 19. On September 25, 1977, Sandra bore another child, Leon Mitchell. It is undisputed that since 1980, and until her mother's sudden death on March 29, 1985, Sakina lived with her mother and Leon, and that there has always existed a close, profoundly affectionate bond between Sakina and her brother Leon. There was a perplexing conflict

in testimony as to where Sakina resided for the first four years of her life, which the Family Court did not undertake to resolve, but which merits discussion.

Petitioner and his mother testified that some three months after Sakina's birth, and at the request of Sakina's mother and maternal grandmother, Sakina came to live with petitioner's mother and remained with her until she was four years old, at which time Sakina's mother established her own home and Sakina came to live with her. Respondent and her sister, both asserting precise knowledge of the facts, insist that throughout the first four years Sakina lived with her mother and maternal grandmother. The issue is perplexing since, except for this conflict, all of the witnesses appear to be credible and trustworthy.

However, even if the testimony of petitioner and his mother on this question were to be accepted, it is apparent that the period of time the child lived with her father was extremely limited because, starting in 1977, he attended college in Syracuse. On petitioner's testimony, Sakina lived with him for a maximum of a year and a half—some six months prior to Sakina's first birthday, and for a period of less than a year when Sakina was three years old, starting with September of 1979, when petitioner did not attend college, and ending with Sakina's entering her mother's home.

On March 29, 1985, Sandra Frank was killed in a subway accident. At the time of her mother's death, Sakina had been visiting with petitioner for the weekend. At the request of Sandra's mother, Irene Ashby, petitioner brought Sakina to the Ashby residence to visit with her grandmother for several days. When petitioner requested Sakina's return, the respondent refused. Petitioner then commenced a paternity proceeding seeking an order of filiation, which was granted, and the order of custody, which was denied after a hearing. Petitioner and respondent agreed that pending the determination of the custody proceeding the child would continue to live with respondent but would visit her father on weekends.

On October 23, 1980, petitioner married Janet Curry, who had two children, five and seven years of age at the time of the hearing. They reside in a two-bedroom apartment, together with two children born of the marriage, who at the time of the hearing were three years, and six months old, respectively. There is no doubt that petitioner, who is gainfully employed, and his wife, are in all respects responsible

people and parents. Although their apartment would appear somewhat crowded, which is also true of respondent's apartment, that circumstance would not appear relevant to the issues before the court.

The record is clear that the petitioner is, and has always been, a loving parent to Sakina. Sakina, during her mother's life, visited petitioner's home on weekends on the average of one out of every two weekends. Under the visitation agreement voluntarily entered into between the parties pending the determination of the custody proceeding, weekend visitation has continued. As to this latter period, the record discloses a conflict between the child herself and the petitioner, his wife, and mother, arising from the child's claim that for the most part she has been sent on these weekend visitations to stay with petitioner's mother, and the contradictory testimony of petitioner and the others that those occasions have been few in number.

There appears no reason to doubt that petitioner and his wife are sincere in their expressions of love for Sakina. On the other hand, there is a substantial basis in the record, primarily in interview statements of petitioner and his mother, for the view that petitioner's wife accepted the prospect of Sakina's entry into their home as a matter of duty to her husband who had previously accepted her children at the time of their marriage.

The record is also clear that the respondent and her husband have provided, and would continue to provide, a responsible, caring environment for raising Sakina and her brother Leon. She and her husband live in a two-bedroom apartment with their two children (now aged 14 and 12), Sakina and her brother Leon.

It is clear that Sakina prefers to remain with her brother in her aunt's home, that this preference is a strong one, and is expressed in terms that leave little room for question as to its emotional intensity. In part this preference is related to her warm, affectionate relationship with her younger brother with whom she has lived most of her life, an affection that is fully reciprocated. In part it appears to result from her sense of happiness and security in her aunt's home. Although she expresses love for her father and his wife, and their children, in particular the youngest child, it is quite clear that she does not feel as comfortable and happy in her father's home as she feels in the home in which she is presently living. The reasons

for this are not entirely clear, and no appropriate purpose can be served by detailing her several comments on the question. But the strength of the feeling is underlined by the circumstance that she not only wishes to continue to live with her aunt and brother, but wants visitation with her father and his family to be limited to once every two weekends.

The following circumstances, established in the record, and the reasonable inferences to be drawn from them, seem to us critical in evaluating whether there exist here extraordinary circumstances that would permit a determination of the issue of custody on the basis of the best interest of the child.

Sakina, 10 years old at the time of the hearing, had not lived with her father since 1980, and quite possibly had never lived with him. At best, from the standpoint of the petitioner, Sakina may have lived with him for no more than a year and a half—six months or less when she was an infant, and for a period of no more than one year when she was three years of age. At the time that her mother died, her most intimate and emotionally involving relationship was with her younger brother, separated from her in age by only a year and three months, and with whom she had lived most of her life.

Although the record does not disclose explicitly the reasons for the respondent aunt's not returning Sakina to her father, it is reasonable to believe that the aunt, who had immediately undertaken the care of Sakina's brother Leon, believed that the separation of the two children from each other in the aftermath of their mother's sudden and shocking death would cause serious, possibly devastating, emotional injury to both. It is also clear that the respondent, by nature of her close relationship to Sakina's mother, and her ongoing affectionate relationship to Sakina herself, was in fact extremely well fitted at a tragic time in the child's life to provide her, as well as her brother, with a stable, loving and caring environment. There can be no doubt that respondent and her husband have done precisely that, and that Sakina and her brother are happy, content and secure in their aunt's home. It is further clear that Sakina does not wish to be separated from her brother and removed from what has become her new home, and that she regards the proposed removal with acute anxiety.

We believe that these critical facts justify the conclusion that the separation of Sakina from her brother and her removal from a home in which she is happy and secure, against her strongly expressed wishes, would at a minimum

inflict on her a severe emotional blow. Although it is of course quite possible that with time Sakina would adjust appropriately to her new situation, there is also at least a realistic possibility that her removal to her father's home at this time of her life, against her will, may have ongoing harmful emotional consequences.

Analysis of the central issue as to whether the facts presented in this record constitute extraordinary circumstances necessarily starts with the opinion of Chief Judge Breitel in *Matter of Bennett v Jeffreys* (40 NY2d 543), an opinion which remains the most balanced, penetrating and insightful discussion of the question. Although the facts in that case are less important than the analysis set forth in the opinion, a brief discussion of the facts will be helpful to an understanding of that which was said.

Petitioner was the natural mother of the child whose custody was in question. The child was born when the mother was 15 years old, unwed, and living with her parents. Under pressure from her mother, petitioner reluctantly acquiesced in the transfer of the infant to an older woman, a former classmate of petitioner's mother. It was found in the Family Court that there was no statutory surrender or abandonment and the Appellate Division had agreed.

Although respondent had intended to adopt the child, she never in fact did so. At the time of the proceedings the mother was 23 years of age, about to graduate from college, and still living with her mother in a home with appropriate quarters for herself and the child. Petitioner's parents were now anxious that their daughter should keep the child. On the other hand, respondent's circumstances in various ways had deteriorated.

The central thrust of the opinion was clearly to correct the widespread misconception that prior authorities had established that in a contest between a parent and a nonparent of a child, the parent can be denied custody only on a finding of culpable conduct. The opinion of the Court of Appeals in *Matter of Bennett v Jeffreys (supra)* emphasized preliminarily that it was addressing an unsupervised private placement as to which no statute was directly applicable, and that analysis must proceed from common-law principles.

The opinion reaffirmed the central principle that absent extraordinary circumstances it was not within the power of the court, or a social agency, to make decisions concerning the

custody of children merely because it would make a better decision or disposition. It reaffirmed that the right of a parent may not be displaced except under extraordinary circumstances such as

"surrender, abandonment, persisting neglect, unfitness, and unfortunate or involuntary disruption of custody over an extended period of time * * *

"The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody." (40 NY2d, *supra,* at 546.)

The opinion further observed *(supra,* at 547) that in *Matter of Spence-Chapin Adoption Serv. v Polk* (29 NY2d 196, 204), the court rejected any notion of absolute parental rights, and "restated the abiding principle that the child's rights and interest are 'paramount' and are not subordinated to the right of parental custody, as important as that right is (p 204)."

The opinion went on to say *(supra,* at 549):

"[I]n ascertaining the child's best interest, the court is guided by principles which reflect a 'considered social judgment in this society respecting the family and parenthood' *(Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204, *supra).* These principles do not, however, dictate that the child's custody be routinely awarded to the natural parent (see *Matter of Benitez v Llano,* 39 NY2d 758, 759) * * *

"[I]ntervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground."

The court went on to observe that in custodial matters (40 NY2d, *supra,* at 549-550):

"The court's determination may be influenced by whether the child is in the present custody of the parent or the nonparent * * * Changes in conditions which affect the rela-

tive desirability of custodians, even when the contest is between two natural parents, are not to be accorded significance unless the advantages of changing custody outweigh the essential principle of continued and stable custody of children [cites omitted] * * *

"In this case, there were extraordinary circumstances present, namely, the protracted separation of mother from child, combined with the mother's lack of an established household of her own, her unwed state, and the attachment of the child to the custodian. Thus, application of the principles discussed required an examination by the court into the best interest of the child."

Finally, the Court of Appeals concluded that the circumstances affecting the best interests of the child had not been adequately explored in the Family Court and that remand for that purpose was necessary.

Under the principles set forth in *Matter of Bennett v Jeffreys (supra)*, we are persuaded that the facts set forth above and the inferences that seem to us to follow from those facts present extraordinary circumstances of the kind that justify an inquiry into the best interests of the child. We observe that in *Bennett* the court considered a variety of factors, including the protracted separation of the mother from the child, in determining the presence of extraordinary circumstances. Inevitably, the circumstances here differ in one respect or another from those addressed in *Bennett.* But we believe that the facts detailed above and the reasonable inferences that seem to us to follow from those facts, taken as a whole, present a situation of comparable gravity to that presented in *Matter of Bennett v Jeffreys (supra).*

We are, of course, aware that in decisions following *Bennett (supra)* involving facts markedly different from those presented either in *Bennett* or in this case, opinions of the Court of Appeals have reminded us that "parental custody of a child may not be displaced absent grievous cause or necessity". *(Matter of Dickson v Lascaris,* 53 NY2d 204, 208; *see also, Matter of Male Infant L.,* 61 NY2d 420, 429.) Nothing in these opinions appears to us to imply any retreat from the central principles set forth in *Bennett.*

We are also aware that in several opinions embodying facts similar to those presented here, albeit with inevitable variations, the majority opinions of Appellate Divisions in other Departments did not find present extraordinary circumstances

that would permit an inquiry into the best interest of the child. *(See, Matter of Tyrrell v Tyrrell,* 67 AD2d 247, *affd for reasons stated* 47 NY2d 937; *Matter of Nadia Kay R.,* 125 AD2d 674, *lv denied* 69 NY2d 608.)

We think it unnecessary to determine whether or not these decisions reflect a view of the meaning of extraordinary circumstances as set forth in *Matter of Bennett v Jeffreys (supra)* different from that set forth here, or turn on distinguishing aspects of the factual situations presented.

We are persuaded that Sakina's welfare would be drastically affected, and that she would sustain a significant emotional injury, with a clear possibility of ongoing harmful consequences, if she were to be separated from the brother with whom she has lived most of her life, and to whom she is bound by the most profound feelings of affection and intimacy, and if she were to be removed at an emotionally vulnerable time in her life from a home in which she and her brother found emotional security in the aftermath of their tragic loss, to live with a parent with whom she had not lived for many years prior to her mother's death, and with whom she may never in fact have lived. These findings, strongly supported by the record, compel the conclusion that there are here present extraordinary circumstances which require that the custodial issue be determined on the basis of the best interests of the child, as to which issue the Family Court's determination was clearly supported by the evidence.

Accordingly, the order of the New York County Family Court (Sheldon M. Rand, J.), entered August 30, 1985, which awarded custody of Sakina Frank to respondent, Cheryl Ashby, should be affirmed, without costs.

SANDLER, J. P., ROSS, MILONAS and ELLERIN, JJ., concur.

Order, Family Court of the State of New York, New York County, entered on August 30, 1985, unanimously affirmed, without costs and without disbursements.