Matter of O.C. v L.T. (2005 NY Slip Op 50951(U))

[*1]

Matter of O.C. v L.T.

2005 NY Slip Op 50951(U)

Decided on February 8, 2005

Family Court, Westchester County

Edlitz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 8, 2005

Family Court, Westchester County
In the Matter of a Proceeding for Custody of O.C., Petitioner,
against
L.T., Respondent.
xxx

Sandra B. Edlitz, J.
The petition which commenced this custody proceeding was filed by Petitioner, O.C., the children's maternal grandmother ("grandmother") against the Respondent, L.T., ("father") the widowed father of three children. The children's mother, died on January 13, 1998. The grandmother seeks an Order of Custody of the middle child. Both the oldest child (pursuant to a prior Family Court Order of Custody entered on consent) and the middle child (pursuant to a Temporary Order of Custody of this Court made after the petition was filed) reside with the grandmother. The youngest child, resides with the father.
The precipitating events ("incident") which resulted in the grandmother's filing the Petition for Custody of the child occurred on two separate days, the first in the father's home on November 11, 2003 when the father, enraged at the child for the extremely messy condition of his room, yelled at the child and threw his belongings down the stairs and the second on November 20, 2003 during a joint therapy session. On November 11, 2003, the child, who had been in the shower, was startled to find his father, furious and enraged, in his room. When his father did not leave the child's room and cease his behavior as requested the child fled the house and, ultimately, went to stay with the grandmother. A few days later, this interaction was followed by two joint therapy sessions held on November 17, 2003 and November 20, 2003 by a psychologist with the child and his father. On November 20, 2003, at the second of the sessions, the child got up to leave. To prevent his leaving, the father restrained the child, physically pushing him into a chair. The therapist terminated the session. The child refused to return [*2]home with his father. As discussed, hereinafter, this incident was not a single event; rather the incident had an antecedent history with a ballooning detonation of behavior which drove the child away from his father, physically and emotionally. The issues presented are whether extraordinary circumstances exist to consider the grandmother's application and if so, whether it would be in the child 's best interests to grant custody to the grandmother. The Court rules in the affirmative as to both issues.
The petition was filed on November 21, 2003. Forensic examinations were completed on June 6, 2004. The Court heard testimony for over eleven days over the course of nine months and conducted in camera interviews of the subject child and his older sibling. The parties were represented by counsel and the child was represented by a Law Guardian. At the conclusion of the hearing the Court directed the submission of written summations and memoranda of law to the Court on November 29, 2004. The Court has had a full opportunity to consider the evidence including testimony, exhibits, forensic reports, and in camera interviews of the subject child , and his older sister. The Court was in a unique position to evaluate the demeanor and credibility of the witnesses. After careful deliberation, this Court grants the petition and awards custody of the child to his grandmother, having found that extraordinary circumstances exist, and that it is in the child 's best interests for his grandmother to become his custodian.
This is not the first petition for custody by the grandmother. On November 15, 2001 both maternal grandparents ("grandparents"), petitioned for custody of the father's three children. Forensic evaluations of the parties and children were performed by Court appointed psychologist. The petition was settled by court order entered on January 14, 2002, granting the grandparents custody of the oldest child. The father retained custody of the two boys. The Court granted the father visitation with the oldest child, initially in conjunction with her therapist, with additional and expanded visitation as recommended by the therapist after consultation with the child. (The father and the oldest child do not visit with each other.) The grandparents were given visitation with the two boys. The Court ordered the father and the children to continue their respective therapy, and the grandparents and the father to cooperate with the children's therapy to the extent recommended by the therapist. Thereafter, pursuant to a petition of the grandparents against the father, a new Visitation Order was entered into on consent of the parties, dated September 5, 2002, in which, the pick up and drop off of the children for visitation was to take place at the White Plains Police Station. Thereafter, pursuant to another petition of the grandmother against the father, in an Order entered on July 16, 2003, on consent, the visitation schedule of the grandparents with the two boys was changed. The Order included provisions regarding family therapy for the children. On November 21, 2003, the grandmother, filed an Order to Show Cause and petition and a Family Offense Petition seeking custody of the subject child and an Order of Protection against the father on behalf of herself and the child. She alleged that the father "has engaged in hostile conduct both physically and verbally toward the subject child to the point that the subject child is fearful of the father and does not wish to reside with the father." The grandmother also alleged that the father "threw" the subject child out of his home on November 11, 2003 and that an incident of abuse occurred in the office of the child's therapist, on or about November 20, 2003, where the father pushed the child down in a chair. She further alleged that the child's therapist [*3]has recommended against the child returning to the father.
On November 26, 2003, this Court issued a Temporary Order of Protection in favor of the grandmother and the subject child against the father, directing the father to stay away from the child, and to refrain from any communication or contact with him except in therapy. The Court granted temporary custody of the child to the grandmother. That Temporary Order of Protection was continued, and modified, at various times throughout the proceeding. On November 26, 2004 the grandmother withdrew the Family Offense Petition. Additionally, in a Interim Order entered on April 23, 2004, the Court reappointed the Court appointed forensic evaluator who had been previously appointed (in connection with the grandparents' prior custody petition) to perform an updated forensic evaluation, including an evaluation of the subject child.
The matter came on for a full day hearing on February 10, 2004 and continued on April 9, 2004, April 20, 2004, April 23, 2004, May 19, 2004, June 8, 2004, July 16, 2004, July 28, 2004, July 29 2005, September 15, 2004, and October 5, 2004. On July 29, 2004, the Court conducted an in camera interview with the oldest child. After the conclusion of all the testimony on October 26, 2004, the Court held an in camera interview with the subject child.

The Court has considered and reviewed the following documents submitted into evidence: a Police Domestic Incident Report dated November 7, 2003, two Progress Reports from the High School dated December 12, 2003 and February 10, 2004, a letter dated November 7, 2001 to the Law Guardian, a Forensic Custody Evaluation dated November 22, 2001 and a Forensic Custody evaluation update dated June 6, 2004 .
The Court has heard the testimony of: the child's therapist (on two separate occasions, one at the beginning of the hearing and another towards the conclusion of the hearing); the Forensic Psychologist; a Police Officer; a Police Sargent; three lay witnesses; the Petitioner and the Respondent. 
At the hearing, on February 10, 2004, the Court qualified the child's therapist, called by Petitioner, as an expert in psychology. He is a Board certified psychologist and child clinical psychologist. He has known this family since in or around August 5, 2003, when the subject child and his siblings were referred to him for therapy by the Law Guardians assigned to the children in that custody case. The reason for the referral was for sibling sessions between the children. It was this prior relationship that led the father to contact the therapist after the incident. The therapist saw the subject child alone, on or about November 13, 2003 two days after the incident. The therapist saw the child with his father on November 17 and 20, 2003. The purpose of these sessions with the father and the child was to diffuse the tension and have the child return home. It was during this latter session that the father pushed the child, and the child did not return home.
On February 10, 2004, the therapist testified that when he discussed the incident with the child, he reported that on the evening of November 11, 2003, his father wanted him to clean his room. They had an argument, and his father got very angry and took things that were all over the room and started throwing them around. The child reported that he was intimidated and that his father said, "why don't you just leave", so he left. The therapist testified that during the joint [*4]session between the father and child on November 20, 2003, a conflict quickly escalated. The father accused the grandparents of brainwashing the child to hate his father, which, according to the therapist, made the child upset, angry, verbally aggressive and provocative towards his father. According to the therapist, there was screaming and yelling back an forth and the child got up and began to leave the room. Thereupon, the father physically attempted to stop the child from leaving by pushing him two to three feet back into his chair. After this exchange occurred, the therapist terminated the therapy session and contacted the Child Protective Services Hotline.[FN1] The therapist testified that he was concerned for the subject child based on what he observed in the therapy session, because if incidents like this occurred while a third party was present, his guess was this was also happening at home. The therapist stated that his concern was that if this was also happening at home, it was not a healthy situation and would create a lot of anxiety for the child causing him continually to run away from the father's home were he forced to return. The therapist stated that his goal in scheduling the joint session was to diffuse the tension between the father and child and ultimately to have child return home. Upon evaluation of the subject child, the therapist discontinued the joint sessions determining that they were harmful and contrary to the child's psychological well-being. The therapist recommended that the child remain at the grandmother's residence in that the child would suffer if he were forced to return to his father's custody at that time.
Some months later, on October 5, 2004, the Law Guardian called the therapist to testify for a second time. The therapist testified that he conducted approximately fifteen sessions with the child since April 2004 when he was last in Court. He testified that his urging of joint sessions between the child and his father caused trust problems between the therapist and the child. The child told the therapist that he felt as if the therapist was acting as his father's attorney, that his father was not honest with the therapist, and that he was buying into the dishonesty. The therapist suspended joint sessions between the child and his father. The therapist testified that since his treatment began and the child began living with his grandmother he became "more comfortable, academically on track and less anxious". The therapist testified that the child is adamant that he does not want to see his father at this time because he does not trust or believe that his father will be able to maintain calm, but, rather will become verbally abusive. The therapist believes that the child's feelings about his father are a product of a series of incidents over time between him and his father where his father's behavior was strongly emotional. According to the therapist, the child's anxiety is caused not merely by one incident but his father's "way of being". The child has seen his father act strongly over the course of his life, and not, necessarily, only to him. The therapist testified that the father has consistently showed a willingness to participate in therapy and has stated that he would like to reconcile with the child and have him return home. The father does not feel that he can have a relationship with the child so long as he is with the grandmother.
The Court found the opinion of the therapist to be reasoned. The therapist testified that it is his opinion that the father can sometimes be appropriate and insightful, but other times can be [*5]rigid in thinking and so verbally assertive that a person would become uncomfortable. The therapist explained to the father the impact of his behavior on the child. The father stated that he understands but makes it clear that he can discipline the way he wants. The therapist testified that it is important that the grandmother encourage the child to improve his relationship with his father. The therapist testified that he does not feel it would be psychologically beneficial for the child to return home at this time. He believes that if he were forced to return home he would run away.
On or about July 16, 2004, the Forensic Psychologist testified. The Psychologist is a Licensed Clinical Psychologist. The Court qualified as an expert in the field of clinical psychology. Pursuant to an Interim Order of the Court, the Psychologist prepared a custody forensic update. In conducting the evaluation update, the Psychologist interviewed the parties, the two older children, the therapist, and the child's advisor at the school. As previously noted herein, the Psychologist has been involved with the parties since 2001, and has previously interviewed the grandmother, father, subject child, the siblings of the subject child, and other individuals related to the child.
The Forensic Psychologist testified that she was greatly disturbed with the father's, "longstanding history of explosive rage reactions in which he becomes uncontrollably angered over insignificant events." (The Court notes that there is no psychiatric diagnosis of "explosive rage".) She opined that the father screams abusively at his children and has difficulty managing his rage. In her view, the father, "has become more narcissistically wounded, and reacts immaturely and impulsively, to the emotional detriment of his children." She opined that the subject child has special emotional and educational needs and that such needs necessitate a more stable and nurturing environment than the father can provide. The Forensic Psychologist testified that while the subject child lived with the father, he was "verbally denigrated and berated" for several years. The Forensic Psychologist recommended that the Court take direct measures to ensure that the subject child is properly cared for, including but not limited to, granting custody to the grandmother.
 On April 9, 2004, the father testified. He testified that he was married to the children's mother until her death in 1998. After his wife died, he had household help, initially. At some point, he discontinued the help. He now does the cooking, cleaning and laundry by himself. The father is a serious, hardworking professional. He loves and wants what is best for his children. As for the incident, the father testified that the child had not been keeping his room clean, and that six months prior to the incident, he discovered firecrackers and burnt materials in the child's room. He discussed with the child that he does not permit firecrackers in the house. (The father is the head of the Office of Fire Prevention for the city he lives in and as such his son's use of fire was particularly concerning.) He testified that on November 11, 2003, while child was in the shower, he entered the child's room to open a window because he smelled a foul odor coming from the room. Upon entry, he found burnt materials in the window, the bed unmade, and clean clothing stuffed in a corner. He searched the rest of the room and he found food and clothing under the bed, open bags of potato chips, open bottles of Gatorade and remnants of a McDonald's salad. He testified that he became upset, and he started "punching" under the bed, and behind the dresser and desk to push clothes out. He started picking up the [*6]clothes and tossing them behind him towards the door. The child asked his father what he was doing. His father replied that he was cleaning up this "pig-stye" and he continued to throw more and more of the child's belongs towards the door. The child came out of the shower and was upset that his father was in his room. He stated it was his method of preparing to do laundry to throw dirty clothing down the steps, and then to bring them to the laundry room. The father testified that the child was in and out of the room, and he was yelling at the child who could not understand why he was so angry. According to the father, the child left the room, yelled at his father from downstairs, saying he wanted to get out of the house and he did not want to hear his father yelling. The father testified he was throwing the items from the child's room down the steps. The child yelled upstairs "I'm out of here", "Dad I love you but I'm leaving." The father testified that the child always said "I love you" whenever he went out. The father said, "if you don't like it here you can leave." The child took his cell phone and left, carrying a plastic bag with belongings.
The father testified at great length about the ways in which the grandmother has interfered with his right to discipline his children. He believes that the grandmother is trying to estrange and take his children away from him. Neither psychologist supports his viewpoint . While there is no love lost between the grandmother and the father, the Court finds no evidence to prove the father's contentions about the grandmother. The Forensic Psychologist believes that the father has exhibited some symptoms of paranoia on this subject. The father's testimony expressed that he is vehemently opposed to maintaining a relationship with the grandmother after everything that has happened between them.
The Court notes it is significant that the grandmother did not file for custody of the child immediately after the incident on November 11, 2003. Instead, she told the child to call his father and testified that she heard the child say to his father, "I'm at mima's house". She brought the child to the therapist expecting that once the father and the child got together in therapy the child would return home. It was only after the joint therapy session on November 20, 2003 while she was in the waiting room when she heard scuffling inside the therapist's office and the child came out crying, that she sought an Order of Protection and Custody. The father admitted that he grabbed the child and pushed him during a therapy session to prevent him from leaving. The father conceded that therapy is needed before the child returns to him but asks the Court to return the subject child to his physical custody after a short period of additional therapy.
The grandmother testified creditably that the child is afraid to reside with his father. She testified that since he has resided with her, the child has made progress in school, his demeanor has improved, and he is affectionate, happy, and relaxed. She stated that he completes his chores around the house, and he abides by the house rules, including curfew. She testified that the child maintains a very close relationship with his sister and that they are devoted to each other. She explained that they spend time together, such as going to the mall, eating pizza and seeing movies. She also stated that his sister occasionally helps the subject child with his homework. The grandmother believes that it would be beneficial for both children to live in the same house. The grandmother explained that the child needs to be nurtured because he has special needs, having been evaluated as having Attention Deficit Hyperactivity Disorder and learning disabilities. The grandmother stated that if she were granted custody of the child that she would [*7]be willing to work with the father because she believes it is important for the child to have a relationship with his father. She testified she understands the child's anxiety regarding his father because she recalls many incidents when the father yelled at the children or lost his temper. Some of the alleged examples include times she dropped the children off at their home and occasions when the children would telephone her crying. During these telephone calls, she would hear the father screaming in the background. She is afraid that the father cannot control his temper and believes that his aggressive behavior has caused the child's anxiety problems. She feels strongly that it would be best for the child to reside with her, his grandfather, and older sister.
B.M., a seventeen year old boy, testified as a witness for the Petitioner. His testimony concerned the incident of November 11, 2003, since he was at the grandmother's home when the child telephoned her. He explained to the Court how he drove with the grandmother and older sister, to pick up the child in a parking lot. When they got to the parking lot the child was crying, and he told them it was because his father kicked him out of the house.
F.D.C., a special education teacher as well as the father's former fiancee, testified as a witness for the grandmother. F.D.C. testified that on the night of November 11, 2003, her daughter called her and told her that the child had called and wanted to be picked up. F.D.C. testified that when she picked the child up he seemed agitated, but was not crying. She claimed that this was "typical behavior." She stated that the child told her that he had a fight with his father, he left the house, and that he wanted to go home with her. Rather than take him home with her, she called his grandmother. F.D.C. stated that at this point the child started to cry.
At trial, F.D.C. was also questioned about father's overall nature and character. She claimed that the father "bellows" even when he is not agitated or upset, and that he is loud with everyone. She stated that she is not afraid of the father. She stated that she once saw the father physically grab the child by the back of his shirt and has seen the father throw things past the child when he was angry. She made it clear that he never actually threw anything directly at the child. On April 9, 2004, a former babysitter for the children, testified on behalf of the father. On the stand she expressed her belief that the father was a good father, and that he did the best he could, considering the circumstances.
On July 29, 2004, the Court conducted an in camera interview of the oldest child. She has lived with her grandparents since approximately 2001. The father and the oldest child do not visit with each other. The effect of the interview, was in line with the position of the grandmother, although not probative of the Court's decision.
The Court conducted an in camera of the subject child near the conclusion of the trial. The child is an emotionally sensitive and artistic child. The child is unlike his father physically and in temperament. Nor is he similar to his younger brother, who is athletic and more in tune with the father. The father is involved with the younger brother's athletic activities and spends time with him to the exclusion of the subject child, who is frequently left home alone feeling isolated while the father is involved with the younger brother's athletic activity. The father does not devote comparable individual time and attention to the subject child, resulting in the subject [*8]child's feeling emotionally isolated and marginalized as compared with the younger brother. The subject child is still suffering the aftermath of the intensity of the incident.
The Court finds that the father's outburst was not a one time occurrence but an explosion point of previous outbursts and behaviors. The father's temperament is, akin to a volcano, with power down deep lying dormant, then erupting in greater or lesser degrees. The incident, as experienced by the child, was one of high decibel. The effect of the father's explosiveness was intensified by his insensitivity to the child's temperament. The outburst had the effect of traumatizing the child and, together with his anger and lack of sensitivity to the child, has estranged him. The interview of the subject child, when added to the other evidence, including the Court's evaluation of the demeanor and testimony of the parties, was persuasive and contributed to the Court's determination.
The Court recognizes the fundamental right of a parent to raise, rear, and direct the upbringing of a child. Troxel v. Granville, 530 U.S. 57, 56. The Court cannot deny the right of a parent absent evidence of "surrender, abandonment, persisting neglect, unfitness, or other like extraordinary circumstance". The non-parent must bear the burden by proving that an extraordinary circumstance exist (see, Bennett v. Jeffreys, supra; Matter of Michael G.B v. Angela L.B. 219 AD2d 289, 291).
While Bennett v. Jeffreys, supra speaks of "surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances", extraordinary circumstances can exist in the absence of abandonment, surrender, neglect or grievous misconduct. (See for example, Torch v. Roberts N.Y.L.J. September 13, 2004, 17, col 2, Family Court, Orange County.) The facts of this case establish extraordinary circumstances in the absence of culpable conduct on the part of the parent sufficient to justify consideration of the child's best interests. Matter of Curry v. Ashby, 129 AD2d 310, 311. The Court in Matter of Michael G.B., supra, stated "what proof is sufficient to establish such equivalent but rare extraordinary circumstances cannot be precisely measured." Similarly, In Matter of Michael B., the Court held "there is no particular set of circumstances that qualifies as extraordinary, and each case must be evaluated on its own merits." Extraordinary circumstances may include separation and disruption of custody for a prolonged period of time and attachment of the child to the custodian. (See, Charles v. Moreno, 293 AD2d 604.) Extraordinary circumstances exist where the parent has "limited parenting skills and lacks child-rearing judgment." (See, Hansen v. Post, 167A.D.2d 702; Banks v. Banks, 285 AD2d 686). In Banks supra, the Court found extraordinary circumstances existed on the untimely demise of one of the child's parents, the poor relationship between the children and remaining parent as evidenced by a refusal to visit with the remaining parent, and the mother's withdrawal as a parent from the lives of her children after she transferred custody to Bankses and the specific needs of the older child. This case is distinguishable because the father was present and active in the child's life. Here, as in Banks, even before the incident, the communication between the father and son had broken down. Since then, despite therapy, the subject child has not spoken to his father for approximately one year, and he refuses to be in the same room as the father.
In this case the Court finds the father's explosive conduct towards his sensitive child, not [*9]only at the time of the incident but also, over a period of years, including and illustrated by his intense anger and manhandling of the child, his marginalizing the child emotionally, and his insensitivity to the effect of his behavior on his son, in the circumstances following his mother's untimely demise constitute extraordinary circumstances.
The Family Court is in a unique position to assess the character and temperament of the parties, the testimony of expert witnesses, and the circumstances that surround the parties' struggle to gain or maintain custody of a minor. (Tompkins v. Sterling, 267 AD2d 315,316, "record revealed" the that both parents were "ill-equipped" to care for the twins [emphasis added]; citing Matter of Louise E.S. v. W. Stephen S., 64 NY2d 946, 947 the trial court judge was able to observe demeanor of witnesses and the wishes of the subject child; Matter of Coyne v. Coyne, 150 AD2d 573, 574, Appellate Division, Second Department, gives great deference to trial courts' decisions if the record conforms with the evidence, because the trial court can assess the information "firsthand). The ability of the Court to evaluate witnesses' mannerisms and credibility gives the Court great latitude to determine whether extraordinary circumstances exist (see, Paul Seth G. v. Antoinette M., 227 AD2d 620, 621).
Having found extraordinary circumstances, the Court must make every effort to determine "what is for the best interest of the child, and what will best promote its welfare and happiness." (Domestic Relations Law, §70). In Eschbach v. Eschbach, 56 NY2d 167, the Court found that the "mother's unreasonable demands and restrictions were jeopardizing the two older daughter's emotional and intellectual development and that there was a total breakdown of communication between the older children and their mother". A "total breakdown of communication" between a parent and child warranted a physical separation because this arrangement was usually in the best interests of the minor (see, Bistany v. Bistany, 66 AD2d 1026; Sandman v. Sandman, 64 AD2d 698; Porges v. Porges, 63 AD2d 712).
The Court credits the psychological testimony in this case, more particularly that of the therapist, who has a firsthand knowledge and experience with the father-son relationship. Two experts in psychology testified that the child expresses strong anxiety regarding the father and that he is afraid of what his father would do if the Court were to force him to return to his father's care. In addition, both experts, the Law Guardian and the Petitioner have expressed credible concern over the father's temper and anger problems which amount to more than just a style of disciplining, as the father would like us to believe. The child has expressed significant fear of returning to his father's house. The therapist testified that this fear is well-founded because the father has not shown any remorse or understanding that his behavior is wrong. In addition, both the therapist and the Forensic Psychologist opined that the child would suffer severe emotional and psychological harm if returned to his father's home.
The child is adamant that he does not want to live with his father. "While not determinative as to the issue of custody, the child's expressed preference is some indication of what is in the child's best interests provided that the Court consider the age and maturity of the child and the potential for influence having been exerted on the child" Schouten v. Schouten, 155 AD2d 461. In the instant matter, the subject child was fourteen years old at the time of the [*10]incident and is now fifteen and one half years old. Even with the passage of time and additional joint therapy sessions prompted by the Court, the child remains adamant in his position. His age and desire to live with the grandmother is a factor considered by this Court in determining who should be granted custody. Although the child has some learning disabilities, he is mature and bright enough to weigh the factors that need consideration to make a rationale determination as to his custodial guardian. In addition, the child has expressed that he will run away if he is forced to return to his father.
The Court finds it would be in the child's best interest for custody to be awarded to the grandmother with this result he will live with his grandparents and sister. To remove him, to return him to his father at this time, would be destructive to his psyche. To permit him to continue to reside in his grandmother's home, in her custody, together with his sister with whom he has a strong emotional bond will allow him to continue to heal and to grow stronger emotionally and is in his best interests.
 Both parties are sincere, well-intentioned and seek sole custody of the child. The father is an intense, powerful person both physically and in his persona. He has shouldered the burden of a single parent after the death of his wife, his children's mother. When asked if he believed in corporal punishment, he responded that it was in his right to use corporal punishment because its part of the discipline process. The father also says now, at the child's age, he wouldn't use corporal punishment. During his interview with the Forensic Psychologist in 2001, the father admitted to "slapping the boys on their behinds and pulling their ears." The father explained his tendency to yell at the children by stating "I bark orders all day long and that's just how it is." He continued saying "if it sounds like I bark orders at the children, this is the way that I know how to get things done and this is my style of disciplining at home". The father admitted to the Forensic Psychologist that he yells and screams too much, but he qualifies that by saying he has a deep voice that comes out scary and booming. The father does not indicate that he makes any attempt whatsoever to alter his voice or behavior in any manner when dealing with the children. Later, the father stated that "I may be a hard disciplinarian and they may not like how I do it, but that's tough." The father admitted to the Forensic Psychologist that his then girlfriend told him that he shouldn't treat the children as harshly as he sometimes does. The father acknowledged that the subject child was "very emotional" and felt that he yelled at him too much, yet he continued to behave in a manner that escalated into the incident that caused the child to leave his home. When the Father was interviewed in 2004, he stated that his children "want a democracy and I am an autocrat".
The father's behavior on the evening of November 11, 2003, was explosive and traumatizing to his son. The intensity of his reaction to the child's messy room and unthinking use of fire was way beyond the triggering event of his son's behavior. The father admitted to the Forensic Psychologist in 2001, that when dealing with his daughter's messy room that he was "inflexible, very strict, conservative and rigid because it was his house and she needs to keep it clean". It does not appear from the record before the Court that the father changed this position in his dealings with the subject child. Although, to his credit, the father sought help with the therapist, he showed no sensitivity to his son's reaction and repeated his traumatizing behavior in pushing his son physically during a therapy session. The father's behavior was the final straw in [*11]this psycho-dynamic relationship between father and son. These precipitating incidents were not sui generis, but rather a cumulation of similar behavior in respect to his son. Nor was the father there for his son, emotionally, subsequent to his mother's death. He marginalized the subject child while devoting more quality time and attention to his younger brother who is athletic and physical like the father, and unlike the subject child.
As previously stated, the Court finds that the father's insensitive behavior towards the child in effectively marginalizing him and traumatizing him both physically and emotionally, coupled with the father's lack of appreciation of the emotional impact of his conduct on his son, in the years following the mother's demise, constitute extraordinary circumstances. The emotional harm inflicted upon the child has come from his father's insensitivity to the child, his ignoring of him and marginalizing him, and uncontrolled anger, verbal assaults and physical intimidation. The Court believes that the father is unwilling to change his method of parenting, even though it is harmful to the child and contrary to current views of child rearing. Reports that the child feels anxious around his father and that the father was not addressing some of the child's special needs are only a few of the factors contributing to the decision to grant the grandmother custody. For all of the aforementioned reasons, this Court finds that it is in the child's best interest for custody to be granted to the grandmother.
The Court looks favorably upon the grandmother's stated willingness to work with the father to assist the child in developing a relationship with his father in the future. The Court is concerned, however, that the relationship between the grandmother and the father is poor and that their relationship may be beyond repair. They must strive to put aside their personal feelings and any animus to each other for the child's sake. It is the Court's urgent hope that the grandmother will encourage and nurture the child to rebuild his relationship with his father. Likewise, it is the equally intensive hope that the father will reach out to the child to rebuild their relationship. The process of rebuilding a relationship would, be aided, no doubt, by the father's engaging in individual therapy.
The Court found this decision to be painful, complex and difficult, particularly since the family has become polarized and divided. It is with a heavy heart that the Court makes this decision in the hope that the father and son will reconcile. However, to force the child to return would be an artificial means of achieving the desired reconciliation. The Court encouraged joint therapy sessions to work toward a rapprochement but despite conjoined sessions with the therapist, the breach between the father and son did not begin to heal. Indeed, it seems clear that the child would run away from home if the Court was to return him to his father at this time. This conclusion was crystalized to the Court during the in camera interview with the Court. Accordingly, it is
 ORDERED, that grandmother's Petition for Custody of the subject child is granted; and it is further
ORDERED, that the grandmother and father continue to cooperate with the child's therapy to the extent recommended by the therapist.
Footnotes

Footnote 1:The therapist testified that he contacted Child Protective Services regarding the incident in the therapy session and was advised that the father's physical contact with the child was not reportable.