Matter of A.B. v D.W. (2007 NY Slip Op 51207(U))

[*1]

Matter of A.B. v D.W.

2007 NY Slip Op 51207(U) [16 Misc 3d 1101(A)]

Decided on June 8, 2007

Family Court, Monroe County

Ruhlmann, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on June 8, 2007

Family Court, Monroe County
In the Matter of a
Proceeding Under Article 6 of the Family Court Act A.B., Petitioner,
against
D.W., Monroe County Department of Health and Human Services,
Department of Social Services, Respondents.
V-10989-06

A.B., pro se, Petitioner
Monroe County Law Department, by Peter A. Essley, Esq., for
Respondent-Petitioner, Monroe County Department of Social Services, Department of Social
Services
Conflict Defender's Office, by Kerri E. Machado, Esq., for Respondent-Respondent
D.W.
Mary Beth Feindt, Esq., Law Guardian

Dandrea L. Ruhlmann, J.
After holding a joint custody and permanency hearing,[FN1] the Court must decide both if it should amend a
Family Court Act (FCA) Article 10 permanency goal to "permanent placement with a fit and
willing relative" and if a non-parent relative petitioner in a FCA Article 6 custody proceeding has
proven extraordinary circumstances. By petition filed August 24, 2006, maternal great aunt A.B.
(Petitioner-[*2][*3]Aunt) filed a
petition for custody of A.C. (dob: //05). A.C. is currently placed in
Petitioner-Aunt's care under an Order Adjourning in Contemplation of Dismissal (ACD) a
neglect petition filed by Monroe County Department of Human Services, Department of Social
Services (Department) against A.C.'s biological mother D.W. (Respondent-Mother) ("Order of
Disposition" entered August 17, 2006, Robert B. Wiggins, J.).[FN2]
The custody proceeding was scheduled for trial at the same time as the FCA Article 10
permanency hearing wherein the Department sought to change the goal to "permanent placement
with a fit and willing relative." The Court approves the goal of "permanent placement with a fit
and willing relative" but denies the custody petition. A.C. shall remain placed with
Petitioner-Aunt under the supervision of the Department. Within 30 days of service of this
Decision and Order, the Department shall seek formal extension of the ACD order or shall file a
violation petition, as it deems appropriate. Respondent-Mother shall continue to receive services
of the Department.
Statement of Facts:
By petition filed January 31, 2006, the Department alleged that
Respondent-Mother neglected A.C.. A.C. was removed from Respondent-Mother's home and
placed with Petitioner-Aunt in February 2006 under supervision of the Department. By order
entered August 16, 2006, the parties consented to an ACD and the Court approved conditions
including, inter alia, A.C.'s continued placement with Petitioner-Aunt, visitation between
Respondent-Mother and A.C., and that Respondent-Mother receive parenting, substance abuse
and mental health counseling. A first permanency hearing was held and the parties consented to
an order entered December 11, 2006 continuing the goal of "return to parent."
Petitioner-Aunt then filed the FCA Article 6 custody petition. Both the Department and Law
Guardian support the petition. The most recent Permanency Report dated March 19, 2007
proposed a new goal of "permanent placement with a fit and willing relative" (i.e.
Petitioner-Aunt) although the Department never filed a petition alleging that Respondent-Mother
violated the ACD order. Respondent-Mother both moved to dismiss the custody petition and
objects to the proposed change in the permanency goal. This Court denied the motion to dismiss
and determined that the custody hearing should be held simultaneously with the permanency
hearing (Matter of A.B. v D.W., __ Misc 3d __). The combined hearing was held on
March 30, 2007 and May 1, 2007. Respondent-Mother did not appear and, although present, her
counsel chose not to participate in the hearing. Two witnesses testified including Department
Caseworker Contessa Noye and Petitioner-Aunt.
A.Testimony of Ms. Noye
[*4][*5]
Ms. Noye testified
that she began working on this case in April 2006. She testified that she has been working with
Respondent-Mother towards the goal of returning A.C. but that Respondent-Mother first must (1)
complete a substance abuse program; (2) have a mental health evaluation and follow treatment
recommendations; (3) maintain stable housing; (4) complete a parenting class; and (5) visit
consistently with A.C..
(1) Substance abuse:
Ms. Noye testified that although Respondent-Mother completed a substance abuse
evaluation, she did not complete a treatment program. Respondent-Mother attended the Restart
Program but left when she was incarcerated for approximately twenty days in January 2007.
Respondent-Mother admitted to Ms. Noye that she chose to serve prison time rather than
probation because that would allow her more time to engage in the services needed for A.C.'s
return.
(2) Mental health:
Ms. Noye testified that she believes Respondent-Mother's biggest issue is her mental health.
She observed that Respondent-Mother was often both unkempt in appearance and sad. At a home
visit in April 2006, Respondent-Mother cried periodically and stared out of the window. Ms.
Noye testified that Respondent-Mother failed to receive a mental health evaluation although she
was referred to the Unity Mental Health Program. Each time Respondent-Mother visits with A.C.
Ms. Noye advises her about the need for a mental health evaluation. Ms. Noye remembers
specifically speaking with Respondent-Mother about mental health treatment both in February
and March of this year.
(3) Housing:
Ms. Noye testified that Respondent-Mother has not had an apartment since April 2006.
Respondent-Mother lived at Alternatives for Battered Women (ABW) from approximately early
November until the end of December 2006. Respondent-Mother admitted to Ms. Noye that she
went to ABW because her boyfriend hit her and demanded that she move out. Ms. Noye testified
that Respondent-Mother is currently homeless and recently applied for emergency public
housing.
(4) Parenting:
Ms. Noye testified that Respondent-Mother completed a parenting program sometime around
May 2006.
(5) Visitation:
Ms. Noye testified that Respondent-Mother does not visit consistently with A.C..
Respondent-Mother's last visit with A.C. was on or about March 7, 2007. Before that
Respondent-Mother visited with A.C. only one time in both January and Febraury 2007. Ms.
Noye testified that Respondent-Mother's visits were also inconsistent in 2006 and
Respondent-Mother would both arrive late for visits and leave early.
Ms. Noye testified that prior to July 2006, Respondent-Mother could visit with A.C. anytime
at Petitioner-Aunt's apartment and was offered overnights. In July 2006, visitation was changed
to supervised only at the Department with Ms. Noye acting as the supervisor. She testified that
she supervised approximately ten (10) visits and that since April 2006 approximately fifteen (15)
visits took place. At the visits Ms. Noye supervised, she observed that A.C. acted shy, covered
her eyes and did not engage [*6][*7]immediately with Respondent-Mother - but by the end of the visits
A.C. and Respondent-Mother both interacted and played together.
Ms. Noye testified that Respondent-Mother never explained why she missed visits and failed
to attend the previous two service reviews. Although Ms. Noye supplies Respondent-Mother
with bus passes, Respondent-Mother admitted that on approximately four different occasions she
sold the bus passes for food money.
(6) Specific admissions regarding Petitioner-Aunt's care for A.C.:
Ms. Noye testified that Respondent-Mother admitted that Petitioner-Aunt provides
appropriate care for A.C.. In April 2006 Respondent-Mother told Ms. Noye that because she
could not care for A.C., she wished to give A.C. to Petitioner-Aunt. Ms. Noye also testified that
sometime around March 2007 Respondent-Mother told her she did not appear in Court because
she "[has]n't done anything that she was supposed to do. And [she] thought [she] was going to
lose custody anyway."
B.Petitioner-Aunt's Testimony
Petitioner-Aunt testified that she has been employed with the City of Rochester for twelve
(12) years as a service representative for the operations department. Her great niece, A.C., has
been living with her in her one-bedroom home since February 2006. A.C. has her own space in
the home and sleeps in a convertible crib. While Petitioner-Aunt is at work, A.C. attends daycare.
Petitioner-Aunt testified that she is able to support A.C.; A.C. has health insurance and is current
with well doctor visits and immunizations. Petitioner-Aunt currently resides in the Rush
Henrietta School District. Petitioner-Aunt attends church regularly and A.C. participates in the
Children's Church Ministry. Petitioner-Aunt has two adult sons who both have good relationships
with A.C..
Petitioner-Aunt testified that when A.C. first moved in, she allowed Respondent-Mother to
visit anytime she pleased - including overnights. She said visitation was changed to the
Department because Respondent-Mother became "very disrespectful" to her. Petitioner-Aunt
testified that Respondent-Mother cursed at her in front of A.C. because Petitioner-Aunt would
not allow her "to take [A.C.] any time she wanted to." Petitioner-Aunt testified that she is willing
to work with Respondent-Mother to arrange for Respondent-Mother to see A.C. "but [she] will
not tolerate [Respondent-Mother's] disrespect." She testified that Respondent-Mother called her
only five times since A.C. has been living with her - twice to speak directly with A.C..
Statement of Law:
(1)Custody Petition - Extraordinary Circumstances
As between a parent and a nonparent, the parent has a superior right to custody that cannot be
denied unless the nonparent establishes that the parent has relinquished that right because of
"surrender, abandonment, persisting neglect, unfitness or other like
extraordinary circumstances" (Matter of Gary G. v Roslyn P., 248 AD2d 980, 981 [4th
Dept 1998], quoting Bennett v Jeffreys, 40 NY2d 543, 544 [1976] [emphasis added];
see also Matter of Wanda P. v Monroe County Dep't of Human Services, 10 Misc 3d
1076[A] [Fam Ct, Monroe County 2006]). Here, although the Department
[*8][*9]
alleged that
Respondent-Mother neglected A.C., it consented to the ACD order.[FN3] There was no neglect finding against
Respondent-Mother and Petitioner-Aunt herein fails to prove "persisting neglect" - or other like
extraordinary circumstance.
A finding of extraordinary circumstances is rare, and the circumstances must be such that
they "drastically affect the welfare of the child" (Matter of Jenny L.S. v Nicole M., 39 AD3d 1215 [4th Dept 2007],
quoting Bennett v Jeffreys, 40 NY2d at 549 [1976]). "The courts and the law are
powerless to supplant parents except for grievous cause or necessity or gross misconduct. A
parent will not be deprived of his or her right to custody merely because a court or social agency
believes it can decide more wisely than the parent or believes it has found someone to better raise
the child" (id. quoting Matter of Male Infant L., 61 NY2d 420, 427 [1984]
[internal citations omitted]). Here, while all parties - including Respondent-Mother - agree that
Petitioner-Aunt is entirely capable and ready to raise A.C., the Court cannot even look to the
child's best interests unless grievous cause, necessity or gross misconduct is proven. Without
such a finding, the inquiry ends (Matter
of Jenny L.S. v Nicole M., 39 AD3d 1215 [citations omitted]).
Although Respondent-Mother is not now in a position to have A.C. returned home, the ACD
was entered just over one year ago, the permanency goal up until now has remained "return to
parent" and the Department never alleged that Respondent-Mother violated the terms of the ACD
order. "Persistent neglect" amounts to more than FCA Article 10 neglect and has even been
defined as "permanent neglect" (Matter of Bisignano v Walz, 164 AD2d 317 [3d Dept
1990], cited by the Fourth Department in Matter of Penny K. v Alesha T., 39 AD3d 1232 [2007] and
Matter of Lynda A.H. v Diane T.O., 243 AD2d 24 [1998], lv denied 92 NY2d
811 [1998]). While the Department argued that Respondent's actions were akin to permanent
neglect, a "permanently neglected child" is one who has been in the care of the Department and
"whose parent or custodian has failed for a period of either at least one year or fifteen out of the
most recent twenty-two months following the date such child came into the care of an authorized
agency substantially and continuously or repeatedly to maintain contact with or plan for the
future of the child, although physically and financially able to do so, notwithstanding the agency's
diligent efforts to encourage and strengthen the parental relationship. . ." (Social Services Law
§ 384-b [7] [a]). Notwithstanding that A.C. has been in care for just over one year, there
was only minimal testimony regarding the Department's efforts to encourage and strengthen the
parental relationship. Indeed, Department regulations require that when a permanency goal is
"return to parent" - as it has been here - the Department must both facilitate at least biweekly
visits and "follow-up with the parent. . . when scheduled visits do not occur in order to ascertain
the reasons for missed visits and to make reasonable efforts to prevent similar problems in [*10][*11]future visits" (18 NYCRR
430.12 [d] [1] [i] [b]). The Department must document all "follow-up efforts. . . undertaken
when scheduled visiting has not occurred" (18 NYCRR 430.12 [d] [1] [ii] b]). Although Ms.
Noye testified that Respondent-Mother never explained her missed visits, reliance on this fact
alone would inappropriately place the onus upon Respondent only.
The New York State Supreme Court Appellate Division, Fourth Department recently
reversed a family court that found extraordinary circumstances where petitioner parent
voluntarily separated herself from her child moving out of state for nine months (Matter of Jenny L.S. v Nicole M., 39
AD3d 1215 [4th Dept 2007]; see also Matter of Michael G.B. v Angela L.B., 219
AD2d 289, 292-293 [4th Dept 1996] [parent's voluntary relinquishment of physical custody is
not sufficient by itself to deprive the parent of custody]). During that nine-month period
petitioner visited her child on only four (4) occasions, although maintaining regular telephone
contact (id.). Here, Respondent-Mother also voluntarily separated herself from her
daughter by signing a consent to temporary placement. While Respondent-Mother has not
exercised her full right to visitation, Ms. Noye testified that during the ten (10) visits that she
supervised,[FN4] the contact
between Respondent-Mother and A.C. was appropriate. Although A.C. acted shy around
Respondent-Mother at first (not unusual toddler behavior), she warmed to her. There was no
evidence regarding how many visits occurred before Ms. Noye became involved with the case.
Petitioner-Aunt testified that Respondent-Mother called only five times to inquire about A.C. and
only twice talked directly with A.C.; unlike in Matter of Jenny L.S. where petitioner
maintained consistent telephone contact, however, here A.C. is only two years old. There
was no evidence concerning the child's ability to communicate effectively over the telephone.
Interesting in Matter of Jenny L.S. - as here - the Law Guardian advocated that
extraordinary circumstances were proven, yet the Court nonetheless found that there was not
enough evidence for such a finding.
A parent's voluntarily relinquishment of her child constitutes one factor to consider in
whether extraordinary circumstances have been proven; however courts should look at both the
parent's intent in relinquishing physical custody and whether such relinquishment was intended
to be temporary (Matter of Michael G.B. v Angela L.B., 219 AD2d 289, 293). Here,
Respondent-Mother consented only to a temporary removal of A.C. because she was
overwhelmed. The underlying FCA Article 10 case was never tried. Respondent-Mother told Ms.
Noye that she wanted to give A.C. to Petitioner-Aunt, but she later explained that she assumed
she was going to lose custody of A.C. anyway. Although the Court takes a negative inference of
Respondent-Mother's failure to appear at trial, Respondent-Mother did appear at the prior court
date for argument of the motion to dismiss the custody petition (where the Court reserved
decision). At that appearance Respondent-Mother did not consent to a permanent relinquishment
of custody.
[*12][*13]
Ms. Noye testified
that she personally observed Respondent-Mother's mental health issues, but did not affirmatively
contact Respondent-Mother to follow up about having a mental health evaluation; rather she told
Respondent-Mother about the importance of mental health treatment each time she saw
Respondent-Mother at visitations (although Ms. Noye also testified that Respondent-Mother
visited only sporadically). Respondent-Mother also failed to complete substance abuse treatment
and does not have adequate housing for A.C., but she did complete her parenting requirement
under the ACD order.
The Department argues that extraordinary circumstances are established, in part, by an
incident sometime around July 2006 that instigated a limitation on Respondent-Mother's
visitation rights. Petitioner-Aunt testified that when A.C. first came to live with her, she allowed
Respondent-Mother to visit anytime including overnights. Petitioner-Aunt then ceased allowing
Respondent-Mother to visit with A.C. in her home because Respondent-Mother cursed at her in
front of A.C. when Petitioner-Aunt would not allow her to "take [A.C.] any time she wanted to."
While Petitioner-Aunt testified that if she was granted custody she would encourage
Respondent-Mother to visit with A.C., she also testified that she would not tolerate
Respondent-Mother's "disrespect." The Court is concerned that without Department oversight
[FN5] communication
between Petitioner-Aunt and Respondent-Mother might deteriorate even more and A.C.'s
relationship with her mother consequently would suffer. Indeed one factor to consider in whether
extraordinary circumstances exist is whether an award of physical custody would deprive the
parent of all custodial rights (Matter of Michael G.B. v Angela L.B., 219 AD2d 289,
294). In Matter of Michael G.B. the respondent biological parent, although losing
primary residency, retained her right to joint custody of the child - a factor important to the court
in finding extraordinary circumstances. Here, Petitioner-Aunt seeks full custody and without
Department oversight it is unlikely that visitation - or any type of relationship - between A.C. and
Respondent-Mother would be fostered.
In sum, Petitioner-Aunt did not prove the requisite "extraordinary circumstances" and thus
her custody petition is dismissed. The Court did not - nor could it (Matter of Jenny L.S. v Nicole M., 39
AD3d 1215 [citations omitted]) - reach the issue of A.C.s best interests on the FCA Article 6
custody proceeding.
(2)PPH - Permanency Goal
The Court nonetheless was required to consider A.C.'s best interests to determine whether a
change of permanency goal is necessary under the FCA Article 10 proceeding. Family Court Act
§ 1089 requires the Court to conduct periodic permanency hearings with an ultimate goal of
ensuring that parties are working towards permanency for the child - so that no child will linger
in foster care. At these hearings, the Court shall consider "the best interests and safety of the
child" and where the child is not returned to the parent determine whether the permanency goal
for the child should be approved or modified and the anticipated date for achieving the goal
(Family Court Act § 1089 [d] [2] [i]). Permanency goals include, inter alia, "return
to parent" or [*14][*15]"permanent placement with a fit and willing relative" (Family
Court Act § 1089 [d] [2] [i] [A] [D]).
There is no case law interpreting what "permanent placement with a fit and willing relative"
means in the context of Family Court Act § 1089; yet the language is not new and was part
of a prior law which first coined the "permanency hearing" (Family Court Act § 1055 [b]
[iv] [B] 5] [iv], Laws 1999, Ch 7). One family court, examining the then-newly required
permanency hearings, opined that "permanent placement with a fit and willing relative" was
utilized by the Legislature as an alternative to the Department having to file a termination of
parental rights (TPR) petition (Matter of Marylou L. v Tenecha L., 182 Misc 2d 457, 466
[Fam Ct, Kings County 1999]). Social Services Law § 384-b [3] [l] [i] [A] requires,
inter alia, that the Department file a TPR petition for any child in foster care for fifteen
out of the most recent twenty-two months unless, inter alia, the child is being
cared for by a relative (see also Department of Social Services Regulations, 18 NYCRR
430.12 [d] [2] [iii] [b] [requiring that the Department document that any child who has been in
care for 15 out of the last 22 months has been discharged from foster care or that a TPR petition
has been filed "unless the plan shows that the child is in the home of a relative"
(emphasis added)]). Indeed, the Court of Appeals has emphasized the importance of promoting
family stability by allowing placement with relatives as an alternative to foster care (Matter of
Michael B., 80 NY2d 299, 316 [1992]). It is especially important because if a parent's rights
have been terminated, a Court no longer can order any contact between the parent and the child -
which may not be in the best interests of the child (see Matter of Jovan J., 7 Misc 3d
1028[A] [Fam Ct, Monroe County 2005] [where this Court noted its frustration that the law does
not provide a mechanism to encourage, where appropriate, a non-traditional relationship between
a child and his biological parent(s) after parental rights are terminated]).
Here, Petitioner-Aunt has cared for A.C. since February 2006. She has both steady
employment and housing. She attends church regularly and has involved A.C. in her church
ministry. While thriving in Petitioner-Aunt's care, A.C. also certainly benefits from continued
contact with her biological mother; indeed Ms. Noye testified that visitation between
Respondent-Mother and A.C. has been positive. No doubt A.C. deserves permanency but she
also deserves a relationship - even if non-traditional - with her biological mother. The best
interests of A.C. thus require that she find permanency in Petitioner-Aunt's care while
maintaining a relationship with Respondent-Mother.
Can the permanency goal be changed to "permanent placement with a fit and willing
relative" while still having Respondent-Mother under the care of the Department? The answer to
this question is a resounding "yes" and in fact is what the law requires of the Department. Where
the permanency plan is placement with a fit and willing relative the Department must continue to
show that reasonable efforts are being made to finalize such permanent placement (Family Court
Act § 1089 [d] [2] [iii] [B]). Further, in any case where placement of a child is extended,
visits shall continue to occur (Family Court Act § 1089 [d] [2] [vii] [A]) and the
Department shall be responsible for facilitating such visits. This is imperative since
Petitioner-Aunt and Respondent-Mother have [*16][*17]disagreed in the past regarding visitation - currently requiring
Department intervention in supervising visits. Even though Petitioner-Aunt has not proven
extraordinary circumstances warranting a best interests analysis as to whether she should be
granted custody, the Court nonetheless finds that modification of the permanency goal to
permanent placement with Petitioner-Aunt is in A.C.'s best interest. All parties - including
Respondent-Mother - agree that A.C. is doing well in Petitioner-Aunt's care. At first blush it
appears incongruous to change the goal to "permanent placement with a fit and willing relative"
while denying custody, yet such a compromise affords the parties an ongoing opportunity to work
together to benefit A.C..
Family Court Act § 1089 - in requiring permanency hearings 60 days after removal and
every six months after that - allows courts and parties some flexibility in planning for permanent
placement of children with relatives while working out an arrangement to continue to foster the
biological parent(s)' bond with the children. The Court herein modifies the permanency goal for
A.C. to "permanent placement with a fit and willing relative." During the next six months the
Department shall work with both Petitioner-Aunt and Respondent-Mother to improve their
relationship to afford Respondent-Mother visitation with her daughter - eventually back in
Petitioner-Aunt's home - as the new goal is for this to be A.C.'s permanent placement. The Court
finds by a preponderance of evidence that this in A.C.'s best interests.
Now, therefore, it is hereby
ORDERED that Respondent's custody petition is denied; and it is further
ORDERED that the permanency goal is modified to "permanent placement with a fit and
willing relative"; and it is further
ORDERED that the Department is charged with continuing to exercise diligent efforts with
regard to engaging Respondent-Mother in services; and it is further
ORDERED that the Department work towards providing visitation between A.C. and
Respondent-Mother in the home of Petitioner-Aunt.
Dated this 8th day of June, 2007, at Rochester, New York.
___________________________
HON. DANDREA L. RUHLMANN
FAMILY COURT JUDGE
Footnotes

Footnote 1: This Court previously
determined that it was a natural extension of case law in conjunction with statutory mandates of
Family Court Act § 1089 to hear both the permanency planning and custody hearing jointly
(Matter of A.B. v D.W., __ Misc 3d __, 2007 NY Slip Op, 27218 [Fam Ct, Monroe
County, decided April 26, 2007]).

Footnote 2: Although the ACD order was to
expire on May 4, 2007 the parties consented to its extension until determination of the issues
currently before the Court (see generally Matter of Jonathan W., 256 AD2d 1174 [4th
Dept 1998] [an expired ACD order is not deemed dismissed when court proceeding is pending];
see also Matter of Sullivan County Department of Social Services v Richard "C", 260
AD2d 680 [3d Dept 1999], lv denied 93 NY2d 958 [1999] [ACD order expired but
respondent's default constituted consent to continued placement of the children]).

Footnote 3: Department regulations require
that a social services agent when acting as the petitioner in a child neglect proceeding shall not
consent to an ACD order if such an ACD is not in the best interests of the child. Petitioner must
consider, inter alia, the seriousness of the alleged incidents of neglect in
determining whether to consent to an ACD (18 NYCRR 432.11 [a], [b] [3]).

Footnote 4: Ms. Noye testified that
Respondent-Mother visited with A.C. a total of fifteen (15) times over a one-year period;
however Ms. Noye personally supervised only ten visits and on this FCA article 6 custody
petition, the Court can consider only non-hearsay testimony. 

Footnote 5: The Department maintains that
if the custody petition is granted, it would withdraw its neglect petition against
Respondent-Mother, leaving her with no services.