OPINION OF THE COURT
Jasen, J.
This appeal involves a natural mother’s attempt to gain custody of her child who has lived with the foster parents since his birth in July, 1980. The precise issue before us is whether the foster parents may retain custody of the child whom they have raised since his birth almost four years ago, where the natural mother has neither surrendered, abandoned nor neglected the child nor been found to be unfit, but, nevertheless, did originally plan with the foster parents before the child’s birth to give them the child for adoption, did consent to provisional custody at the child’s birth, and, furthermore, is poor, unwed and an illegal alien who speaks little English and has no settled plans for the child’s and her own future. This case involves the very fundamental rights and responsibilities at the heart of the parent-child relationship and, as with other similar cases, has been a source of the deepest emotions and pain for the parties. Resolution of a dispute like the one presented, involving such paramount and basic concerns, demands faithful attention and adherence to the strong public policies and overriding principles which have governed our past decisions. The specific facts in this case, as with most complicated disputes, are somewhat unique. Nonetheless, *424 they present a broad outline not wholly unfamiliar to this court.
Beginning sometime in January, 1980, respondents Susan and James H., a childless couple residing in New York City, sought to arrange for the custody and ultimate adoption of the expected child of petitioner Christina L., a young, unwed, resident alien, working as a domestic in San Francisco. Through a mutual acquaintance in California, the parties exchanged their intentions: petitioner wishing to relinquish and the respondents wishing to adopt the baby at birth. The respondents’ New York attorney, Michael Mossberg, began the preparations for what would be necessary to bring the baby to New York for adoption, and their California attorney, Kiernan Manjarrez, met with petitioner to discuss her wishes and those of the respondents. In April of 1980, Manjarrez arranged for another attorney, Richard Bryant, to represent petitioner on a pro bono basis, and both lawyers explained to her the adoption procedures and the necessary forms to be signed. After being advised by both attorneys that the completion of certain papers required under the Interstate Compact on the Placement of Children (Social Services Law, § 374-a) would neither finalize the adoption nor divest her of parental rights, she signed a document declaring that “[i]t is my wish and I hereby consent that my child or children be placed for adoption with the aforementioned Mr. and Mrs. James [H.].”
In May, petitioner began to meet with a social worker at Manjarrez’s suggestion and, when she expressed some reservations to the latter, he also suggested that she consult a priest who apparently put her fears to rest for the time being. In June, Manjarrez secured the written consent of the child’s father to the proposed adoption and around the same time he informed petitioner that the respondents planned to take the baby to New York to initiate adoption proceedings there. He also reassured her, however, that the adoption would not be final at that time, but would be so only after she gave her approval before a California Judge and a New York court gave its approval as well.
On July 16, 1980, petitioner gave birth and the respondents immediately flew to California. After petitioner *425 signed the necessary hospital release and an adoption placement form, the respondents returned to New York with the baby. The adoption placement form which petitioner executed provided that “I understand that this declaration is not a consent to adoption and that in signing this document I retain my legal rights to the custody, control, earnings and support of said child.” It was consistent with the assurances she had uniformly received from both parties’ lawyers and her social worker.
In August of 1980, between two and three weeks after the birth of her son, petitioner apprised Manjarrez of her desire to regain her child. She was referred to her own attorney and in turn referred to Ramiro Castro, who replaced him. Manjarrez, who was arranging for a court date in California to obtain petitioner’s final approval for the adoption, received a letter from Castro in October, notifying Manjarrez that petitioner was withholding her consent to the adoption and was considering instituting proceedings to regain custody of her child. A copy of the letter was forwarded to Mossberg, the respondents’ New York attorney, and he informed them of petitioner’s change of heart. Additionally, around the same time, the respondents heard from the parties’ mutual acquaintance who had made the initial introductions. Likewise, she informed the respondents that petitioner wanted her baby back. The respondents were apparently and understandably devastated, but they were determined to keep the child. Indeed, they followed their New York attorney’s advice not to return to California where they might more readily be served with process.
Petitioner instituted a habeas corpus proceeding in California to secure her child’s return, but it was unsuccessful. Castro advised her that she would have to go to New York, but petitioner had neither the funds to make the trip nor a place to stay. After saving her wages and making arrangements through Castro for maintenance and legal services in New York City, she arrived in May, 1981. Shortly thereafter, on June 10, 1981, petitioner filed a petition in Family Court to regain custody of her son. A few days later, the respondents petitioned for adoption and retention of custody, and these matters were consolidated.
*426 The trial commenced and continued intermittently, being drawn out over the following nine months. The testimony showed that the respondents were exemplary parents and that the child was healthy, happy and developing properly under their care. The evidence also showed that petitioner was an illegal alien from El Salvador; that she had worked there for many years at a school caring for children, has likewise cared for children for several years in this country, employed as a domestic in both California and New York, and is well regarded in that capacity; and that she is presently poor and does not speak English fluently. There was confusion whether petitioner planned to return to El Salvador with the child, marry the father — now infeasible because of his subsequent marriage — or return to San Francisco to live with a friend. Finally, there was expert testimony that the child would probably suffer some “negative short term consequences” if he were removed from his foster parents, but that petitioner has been visiting him regularly since she arrived in New York City and the child might be susceptible to no such harm at this point.
Family Court rendered three separate opinions dated March 31, 1982, May 28, 1982, and August 20, 1982, respectively, each adhering to the same conclusion that the law requires that the child be returned to the natural mother. The court believed that it would be better for the child to remain with the foster parents, but finding that petitioner was fit and that she neither formally consented to the adoption nor abandoned the child, granted her custody “under the constraint of appellate precedents” (115 Misc 2d 248). A divided Appellate Division affirmed, finding petitioner to be both fit and devoted, and holding that absent extraordinary circumstances, not present here, the court may not intervene between the natural parent and child to determine if the latter’s best interests would be better served under someone else’s care. We now agree and affirm.
It has long been the law in this State that a parent has “a right to the care and custody of a child, superior to that of all others, unless he or she has abandoned that right or is proved unfit to assume the duties and privileges of parenthood.” (People ex rel. Kropp v Shepsky, 305 NY 465, 468; *427 see Matter of Dickson v Lascaris, 53 NY2d 204, 208; People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185, 192.) In the absence of “surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances”, a parent may not be denied custody. (Matter of Bennett v Jeffreys, 40 NY2d 543, 544; see Matter of Dickson v Lascaris, supra, at p 208.) The State may not deprive a natural parent of her child’s custody merely because a court or social agency believes it can decide more wisely than the parent or believes it has found someone to better raise the child. So long as the parental rights have not been forfeited by gross misconduct (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204; see Matter of Gustow, 220 NY 373, 377) or other behavior evincing utter indifference and irresponsibility (see, e.g., Matter of Cleaves, 6 AD2d 138), the natural parent may not be supplanted (see Stanley v Illinois, 405 US 645, 651). Indeed, even where such “forfeiture” or “extraordinary circumstances” are found to exist, the best interests of the child must still thereafter be determined before the natural parent may be displaced. (Matter of Bennett v Jeffreys, supra, at p 548.) Otherwise, the question of best interests itself is not even reached. (Matter of Merritt v Way, 58 NY2d 850.) For once it is found that the parent is fit, and has neither abandoned, surrendered, nor otherwise forfeited parental rights, the inquiry ends and the natural parent may not be deprived the custody of his or her child.
Here, both lower courts found no surrender, abandonment, persistent neglect or unfitness of petitioner. Indeed, the record is clear that she never gave her final formal consent to the respondents’ permanent custody of her child but, instead, she relied upon the assurances of both parties’ lawyers and her social worker that nothing would be irrevocable until she declared her intentions to surrender her baby to the respondents before a California court, which, of course, she never did. The record also shows, in the words of the majority at the Appellate Division, that she “has ever been very devoted, dedicated to the struggle to regain her child — overcoming her lack of language and her paucity of funds, by her trek across America, by her persistent visits to the child, as well as by her legal *428 efforts.” (95 AD2d, at p 30.) The affirmed findings of the lower courts, being supported by evidence in the record, will not be disturbed by this court. (People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d, at p 189.) Consequently, the “best interests” test is never reached and petitioner may not be deprived of custody of her child.
In Matter of Bennett v Jeffreys (supra, at p 548), this court held that a “disruption of custody over an extended period of time” could amount to an extraordinary circumstance sufficient to justify inquiry into whether custody with a nonparent would best serve the child’s interests. While it is true in the instant case that the child has not been in his mother’s custody since birth almost four years ago, and has remained with the respondents for that entire period, it is nonetheless also true that petitioner requested her infant’s return within three weeks of his birth and has persisted since that time in seeking to regain custody, as well as visiting the child regularly since she arrived in New York City. Indeed, to the extent that there exists a “disruption of custody over an extended period of time”, it is in large measure, if not almost entirely, for reasons outside petitioner’s control. Her early demand for the child’s return was ignored by the respondents, the habeas corpus proceeding in California was unsuccessful — not the least because the respondents deliberately stayed away — she needed time to save money for her trip to New York and to arrange for accommodations and legal services, and, not insignificantly, though she commenced her petition in Family Court almost as soon as she arrived in this State, the proceedings were somehow prolonged in that court for nine months before the first of its three separate rulings were issued.
While “the child may be so long in the custody of the nonparent” that separation from the natural parent amounts to an extraordinary circumstance, especially when “the psychological trauma of removal is grave enough to threaten destruction of the child” (Matter of Bennett v Jeffreys, supra, at p 550), nevertheless, as earlier noted, this court has always adhered to the view that natural parents are generally best qualified to care for their own children unless disqualified by “gross miscon *429 duct” (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d, at p 204) and indeed the “courts and the law * * * under existing constitutional principles, [are] powerless to supplant parents except for grievous cause or necessity.” (Matter of Bennett v Jeffreys, supra, at p 548; Stanley v Illinois, supra, at p 651.) When, in a case such as this, the separation between the natural parent and child is not in any way attributable to a lack of interest or concern for the parental role, that separation does not amount to an extraordinary circumstance and, indeed, deserves little significance. (Matter of Dickson v Lascaris, 53 NY2d, at p 210; Matter of Sanjivini K., 47 NY2d 374, 381.) Nor is it of much consequence that provisional custody was gained by the respondents with the natural parent’s consent. “Instead, [a] change of mind is to be accorded great sympathy, and, in a proper case, encouragement and favorable action.” (People ex rel. Anonymous v New York Foundling Hosp., 17 AD2d 122, 125, affd 12 NY2d 863.) Indeed, this is especially so where the natural parent has sought return within a very short time and has taken whatever actions were available without delay. (People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d, at p 194.)
Here, where virtually all the separation between parent and child occurred during the natural mother’s attempts to regain custody, the separation does not amount to an extraordinary circumstance on a level with unfitness, abandonment, persistent neglect or other “gross misconduct” or “grievous cause”. Indeed, the courts may not “ ‘deny [the natural parent’s] persistent demands for custody simply because it took so long’ ”. (Matter of Dickson v Lascaris, 53 NY2d, at p 210, quoting Matter of Sanjivini K., supra, at p 382.) Consequently, the question of best interests does not arise and the natural parent must be awarded custody.
Additionally, as we have emphasized on previous occasions, the resolution of custody disputes such as this one ought not to provide an incentive for those who have attempted to take the law into their own hands. (Matter of Bennett v Jeffreys, supra, at p 550.) Here, the respondents disregarded the natural mother’s entreaties for her child’s return and assiduously avoided contact with her, her attor *430 ney and the jurisdiction of the California courts which might have demanded that they relinquish the child. The mere passage of time cannot undo the wrong thus visited upon the natural mother and ultimately upon the child as well, and ought not now to redound to the respondents’ benefit.
Finally, petitioner’s poverty and alienage must not be held against her. Such socioeconomic factors, unless sufficient to establish neglect or unfitness of the parent under the specific circumstances of a particular case, are irrelevant and impermissible considerations. (Cf. People ex rel. Scarpetta v Spence-Chapin Adoption Serv., supra, at p 194.) The comparative material advantages offered by the nonparents are emphatically not an extraordinary circumstance disqualifying the natural parent, nor can they outweigh parental rights under the guise of determining the best interests of the child. “In no case * * * may a contest between a parent and nonparent resolve itself into a simple factual issue as to which affords the better surroundings, or as to which party is better equipped to raise the child.” (People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d, at p 194; see Matter of Bennett v Jeffreys, supra, at p 550; People ex rel. Portnoy v Strasser, 303 NY 539.)
Here, there has been shown no “extraordinary circumstances, narrowly categorized” and consequently “it is not within the power of a court” to determine the best interests of the child. (Matter of Bennett v Jeffreys, 40 NY2d, at p 545.) Petitioner, having neither abandoned her parental rights, neglected her parental responsibilities, nor been shown to be unfit to assume the duties of parenthood, has the right to the care and custody of her child and, therefore, her petition must be granted.
For the reasons stated, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Cooke and Judges Jones, Wachtler, Meyer and Simons concur with Judge Jasen; Judge Kaye taking no part.
Order affirmed, with costs.