# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**212**
**CAF 13-02243**
PRESENT: CENTRA, J.P., PERADOTTO, SCONIERS, AND DEJOSEPH, JJ.

---

IN THE MATTER OF RICARDO SUAREZ AND LAURA
SUAREZ, PETITIONERS-RESPONDENTS,

V

OPINION AND ORDER

MELISSA WILLIAMS, RESPONDENT-APPELLANT,
AND ERNESTO SUAREZ, RESPONDENT-RESPONDENT.

---

MELVIN & MELVIN, PLLC, SYRACUSE (CHRISTOPHER M. JUDGE OF COUNSEL), FOR
RESPONDENT-APPELLANT.

LINDA M. CAMPBELL, SYRACUSE, FOR PETITIONERS-RESPONDENTS.

PATRICK J. HABER, ATTORNEY FOR THE CHILD, SYRACUSE.

---------------------------------------------------------------------------------------------------------------------

Appeal from an order of the Family Court, Onondaga County
(Michele Pirro Bailey, J.), entered March 26, 2013 in a proceeding
pursuant to Family Court Act article 6.  The order, among other
things, awarded petitioners Laura Suarez and Ricardo Suarez and
respondent Ernesto Suarez joint legal custody of the subject child.

It is hereby ORDERED that the order so appealed from is
unanimously reversed on the law without costs and the petition is
dismissed.

Opinion by CENTRA, J.P.:

The issue raised in this case is whether petitioners, the
grandparents of the child who is the subject of this proceeding,
established extraordinary circumstances to deprive respondent mother
of custody of the child.  We conclude that they did not, and we
therefore conclude that the order should be reversed and the petition
dismissed.

### Facts and Procedural History

The mother and respondent father are the parents of the child,
who was born in August 2002.  The mother has two daughters from a
previous relationship who have always lived with her and who were
approximately six and nine years old, respectively, when the child was
born.  Petitioners are the paternal grandparents of the child who have
had a very close relationship with the child since his birth and have
helped raise him.  The testimony at the hearing was conflicting
regarding the extent to which the child has lived with petitioners.

Family Court found that petitioners' version of where the child lived was substantiated by their witnesses, whereas it found that the testimony of the mother's witnesses lacked credibility. We perceive no reason to disturb the court's credibility determinations (*see Matter of Terry L.G.*, 6 AD3d 1144, 1145; *Matter of Pamela S.S. v Charles E.*, 280 AD2d 999, 1000), and we therefore summarize the facts as presented primarily by petitioners and their witnesses.

Within days after the child was born, petitioners took the child into their home to live and enrolled him in daycare. At the time, petitioners lived in Barneveld and the mother lived 12 miles away in Utica, working full-time for an insurance company. The mother, who had a close relationship with petitioners, saw the child several times a week. Two years later, the father moved to Massachusetts, where he still resides. In 2006, petitioners paid a deposit for a trailer across the street from them in which the mother and her daughters could live, thereby enabling the mother to see the child more often. That same year, petitioners obtained jobs in the Syracuse City School District (SCSD), and they moved to Syracuse the following year with the child. They enrolled the child in an elementary school in the SCSD. Although the child lived with petitioners and attended school in the SCSD, he continued to see the mother during the week and stayed with her on the weekends. In 2006 the mother's parents became ill, and she spent time caring for them and saw the child less frequently until late 2008, when petitioners moved the mother's trailer to Liverpool and she began visiting with the child more frequently.

In May 2012, the mother told petitioners that she intended to enroll the child in the school district where she lived and have him live with her. In June 2012, petitioners filed the instant petition seeking custody of the child. Up until that time, the child continued attending the same SCSD school he had attended since kindergarten, and he visited with the mother several times a week, including overnight visits. Although petitioners enrolled the child in various after school activities, they always discussed those activities with the mother before doing so. The grandmother spoke to the mother daily about the child, including his schooling and activities. On three occasions, the mother gave petitioners written permission to make educational and medical decisions on the child's behalf.

At the conclusion of the hearing and after a *Lincoln* hearing, the court granted the petition and awarded petitioners joint legal custody of the child with the father, who had consented to the relief requested by petitioners. Petitioners were awarded primary physical custody, with visitation with the mother and the father. We now reverse.

### *Analysis*

As the Court of Appeals held in the seminal case of *Matter of Bennett v Jeffreys* (40 NY2d 543, 544), "[t]he State may not deprive a parent of the custody of a child absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances." The Court thereafter held that, "[s]o long as the

parental rights have not been forfeited by gross misconduct . . . or
other behavior evincing utter indifference and irresponsibility . .
. , the natural parent may not be supplanted" (*Matter of Male Infant
L.*, 61 NY2d 420, 427). "The nonparent has the burden of proving that
extraordinary circumstances exist, and until such circumstances are
shown, the court does not reach the issue of the best interests of the
child" (*Matter of Michael G.B. v Angela L.B.*, 219 AD2d 289, 291; *see
Matter of Amanda B. v Anthony B.*, 13 AD3d 1126, 1126).

Based on the facts as presented above, the arrangement between
petitioners and the mother since shortly after the child's birth and
for 10 years thereafter was akin to a joint custody arrangement with
petitioners having primary physical custody of the child and the
mother visitation. Petitioners established that they took on the bulk
of the responsibility for the child's financial support and education.
There was no showing by petitioners, however, that the mother was
unfit or that she surrendered or abandoned her child (*see Michael
G.B.*, 219 AD2d at 292). The question then is whether they established
"other equivalent but rare extraordinary circumstance[s] which would
drastically affect the welfare of the child" (*Bennett*, 40 NY2d at
549).

As we have held, "[w]hat proof is sufficient to establish such
equivalent but rare extraordinary circumstances cannot be precisely
measured" (*Michael G.B.*, 219 AD2d at 292). "[T]he fact that [a]
parent agreed that a nonparent should have physical custody of the
child or placed the child in the custody of a nonparent is not
sufficient, by itself, to deprive the parent of custody" (*id.* at 292-
293). Here, while the mother allowed petitioners to have primary
physical custody of the child for a prolonged period, there were no
other factors to show the existence of extraordinary circumstances
(*cf. Bennett*, 40 NY2d at 550). The record establishes that the child
is psychologically attached to both petitioners and the mother, and
there was no evidence that removing the child from petitioners'
primary custody would result in "psychological trauma . . . grave
enough to threaten destruction of the child" (*id.*). The evidence at
the hearing showed that the child exhibited some signs of stress after
May 2012, but the record as a whole, including the *Lincoln* hearing,
supports the conclusion that the child was stressed because of the
family conflict, and would not suffer if the mother had custody of the
child.

The court, relying upon Domestic Relations Law § 72 (2), found
the existence of extraordinary circumstances in this case because
there was an extended disruption of custody. Domestic Relations Law §
72 was amended in 2003 to add subdivision (2) "to provide guidance
regarding the ability of grandparents to obtain standing in custody
proceedings involving their grandchildren" (L 2003, ch 657, § 1).
Domestic Relations Law § 72 (2) (a) allows a grandparent who "can
demonstrate to the satisfaction of the court the existence of
extraordinary circumstances" to apply to a court for custody of a
child. That subdivision further states that "[a]n extended disruption
of custody . . . shall constitute an extraordinary circumstance"

(*id.*). Domestic Relations Law § 72 (2) (b) provides that " 'extended disruption of custody' shall include, but not be limited to, a prolonged separation of the respondent parent and the child for at least twenty-four continuous months during which the parent voluntarily relinquished care and control of the child and the child resided in the household of the petitioner grandparent or grandparents."

Petitioners and the Attorney for the Child (AFC) contend that the statute does not require a showing that the parent relinquished "all" care and control of the child, and the AFC further contends that we should not rely on cases that predate the 2003 amendments to Domestic Relations Law § 72. In our view, however, the standard of extraordinary circumstances remains as it was set forth in *Bennett*. That standard is rooted in constitutional rights, and "the courts and the law . . . under existing constitutional principles . . . [are] powerless to supplant parents except for grievous cause or necessity" (*Bennett*, 40 NY2d at 548, citing *Stanley v Illinois*, 405 US 645, 651 [listing the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and the Ninth Amendment]). As the Court stated in *Bennett*, "neither decisional rule *nor statute* can displace a fit parent because someone else could do a 'better job' of raising the child in the view of the court (or the Legislature), so long as the parent or parents have not forfeited their 'rights' by surrender, abandonment, unfitness, persisting neglect or other extraordinary circumstance" (*id.* [emphasis added]). We therefore reject the AFC's implicit assertion that Domestic Relations Law § 72 (2) (b) in any way eases a grandparent's burden of showing extraordinary circumstances, and we conclude that *Bennett* and cases decided thereafter remain good law.

In light of the high standard, and in view of the mother's consistent contact with the child and petitioners' constant communication with the mother and reliance on her permission to make decisions about the child, we cannot conclude that petitioners have demonstrated extraordinary circumstances sufficient to deprive the mother of custody of her child. As we have explained, "[a] finding of extraordinary circumstances is rare, and the circumstances must be such that they 'drastically affect the welfare of the child' " (*Matter of Jenny L.S. v Nicole M.*, 39 AD3d 1215, 1215, *lv denied* 9 NY3d 801, quoting *Bennett*, 40 NY2d at 549). In our view, petitioners failed to meet this high bar, where their own witnesses testified that the mother maintained a presence in the child's life consistently, even while he was living primarily with petitioners (*see id.* at 1216; *Matter of Woodhouse v Carpenter*, 134 AD2d 924, 924-925).

### Conclusion

Accordingly, we conclude that the order should be reversed and the petition dismissed. In light of our determination, the remaining

issues raised by the mother on appeal are academic.

Entered:  March 20, 2015                         Frances E. Cafarell
                                                 Clerk of the Court