Matter of D.P. v S.R. (2024 NY Slip Op 50212(U))

[*1]

Matter of D.P. v S.R.

2024 NY Slip Op 50212(U)

Decided on February 16, 2024

Family Court, Kings County

Markoff, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 16, 2024
Family Court, Kings County

In the Matter of a Proceeding for Custody under the Uniform Custody and Enforcement Act, D.P., Petitioner,

against
S.R., Respondent.

Docket No.: V-10386-23

The petitioner D.P. was represented by Arthur Aden Edwards, Esq. 
The respondent S.R. was represented by Jeffrey Nathan Markowicz, Esq. 
The subject child was represented by Beverly Jan Gertler, Esq. of the Children's Law Center.

Robert A. Markoff, J.

Recitation, as required by CPLR §2219(a), of the papers considered in the review of the respondent's motion for an order pursuant to CPLR § 3212 granting him summary judgment:
Notice of Motion
Attorney Affirmation
Decision and Order After Trial dated March 30, 2023
Petition dated May 18, 2023
AFC's Motion by OSC dated April 4, 2023, to set aside the Decision and Order After Trial
Affirmation in Opposition to Respondent's Motion for Summary Judgment
Petitioner's Exhibits 1-2
Affirmation in Opposition
Exhibits A-I
Attorney Affirmation (Respondent's Reply)
Exhibit 1
Exhibit A
I. Introduction
Before the court is the father's motion for summary judgment dismissal of the maternal [*2]aunt's custody petition on the ground that the aunt lacks standing to petition for custody. In opposition, the attorney for the child contends that the aunt has standing based on alleged harm that would come to the child if de facto custody with the aunt were disturbed. Resolution of the motion requires, inter alia, examination of cases recognizing that a nonparent may demonstrate the requisite extraordinary circumstances to seek custody where the "psychological trauma of removal [from the nonparent] is grave enough to threaten the destruction of the child" (see Matter of Bennett v Jeffreys, 40 NY2d 543, 550 [1976]; Matter of Adoption of L., 61 NY2d 420, 428 [1984]). For the reasons set forth herein and under the circumstances of this case, the alleged psychological trauma of the child cannot be the basis of an extraordinary circumstances finding. This determination is made in the context of the family court's prior determination, following a hearing, that without the father's consent, the aunt took custody of the child in derogation of the father's parental rights and responsibilities, and that prior to this, the father and child enjoyed a positive parent-child relationship. As such, this Court must grant the father's motion for summary judgment dismissal of the aunt's second custody petition.
II. Procedural and Factual History
A. The Prior Proceeding
On May 25, 2021, the petitioner D. P. ("the aunt") filed a petition against the respondent S. R. ("the father") seeking sole custody of P. S. ("the child"). The Family Court (Friederwitzer, J.) held a fact-finding hearing that occurred over four days in January 2023, and conducted an in camera interview with the child. By order dated March 30, 2023, the Family Court (Friederwitzer, J.) issued a typed 15-paged Decision and Order After Trial in which it dismissed the aunt's petition for lack of standing.
In the Decision and Order After Trial, the court set forth the following findings of fact and conclusions of law. The child was born in Maryland on January 11, 2023. When the child was 9 months old, A.S. ("the mother") moved with the child to New York, and the father stayed in the Washington, D.C. area. The mother and child lived in New York until 2017. During the period when the mother and child resided in New York, the father's access to the child was limited. It was undisputed that the father voluntarily provided financial support to the child. Although the father was not proactive in seeking a relationship with the child during that early period, he made visits to New York to spend time with the child. During that early period, the maternal aunt resided with the child and the child's mother.
In 2017, the mother and child moved out of New York and returned to Maryland. From 2017 to April 2021, the father regularly visited the child, including having the child for overnight visits. On April 15, 2021, the child's mother died. The Family Court found that during the four-year period that the child lived in Maryland until the mother's death, the father and child "undeniably enjoyed a parent-child relationship and engaged in regular visitations."
On April 16, 2021, the day after the mother's death, the aunt and the father met to discuss custody of the child. Initially, the father agreed that the child should live with the aunt in New York. A few hours after the meeting, however, the father telephoned the maternal aunt to inform her that he wanted custody of the child. During the telephone conversation, the maternal aunt proposed that the father have only weekend and holiday visits, a proposal which the father rejected. The next day, on April 17, 2021, the aunt, without the father's permission, took the child from Maryland to New York and informed the father that she intended to keep the child in her [*3]custody.
Immediately thereafter, the father retained counsel and commenced a proceeding in Maryland.[FN1]
The aunt then filed a custody petition in New York in May 2021. Delaying the ultimate resolution of the custody case was the aunt's unsuccessful challenge to the father's paternity. During the pendency of the first New York custody proceeding, the father sought unsupervised access to the child, but settled on court-ordered supervised visits. The father traveled from Washington, D.C. to New York for all court-ordered in-person visits. While he missed one phone call with the child due to a change in his work schedule, he attended all the in-person supervised visitation sessions. Notably, the father did not provide financial support once the aunt unilaterally took custody of the child. The father did not contact the aunt to inquire about the child's medical, educational, and extracurricular status, preferring to obtain such information through court proceedings.
In the Decision and Order After Trial, the court dismissed the aunt's custody petition based upon its determination that, as a nonparent, the maternal aunt failed to establish that she had standing to seek custody against the child's father (see Matter of Bennett v Jeffreys, 40 NY2d 543, 550 [1976]).
In reaching its determination, the court rejected the maternal aunt's claim that the father abandoned and persistently neglected the child. Indeed, the court found that the deterioration of the father-child relationship occurred "while the child was under the maternal aunt's care, casting a shadow on her claim for custody." The court found that the maternal aunt "created a situation where the child depended solely on her and the maternal side of the family when she took the child just two days after the mother's death," and perhaps "negatively influenced the child's access to emotional support from the father during her bereavement." The court found that "the record offers no evidence to refute the father's claim that he shared a loving relationship with the child at the time of the mother's passing," and that only after coming under the maternal aunt's care during a vulnerable emotional period has the child developed "animosity towards her father." The court found that "the maternal aunt's actions effectively deprived the child of her one remaining parent following her mother's death, further exacerbating the child's distress and loss." The court determined that the maternal aunt failed to show that the father was absent from the child's life or was unfit to care for the child.
The court rejected the argument of the attorney for the child (hereinafter "AFC") that extraordinary circumstances existed based upon the mother's death, the child's grieving process with the maternal aunt, and the father's lack of any primary custodial role in the child's life. The court determined that it could not find that the aunt had equal rights to seek custody of the child based on the father's consent to a custodial arrangement with the mother while the mother was [*4]alive; further, the father "wasted no time seeking custody after the mother's passing."
Recognizing that the maternal aunt had assumed the role of the child's primary caretaker since April 2021 and had forged a strong bond with the child, the court determined, in accordance with Bennett v Jeffreys (40 NY2d at 548), that a parent cannot be displaced merely because another person would do a "better job of raising the child" or because the child has bonded psychologically with a nonparent (id.). In reaching its conclusion, the court also determined that there was "no testimony or evidence offered to demonstrate that the child would suffer what some courts define as 'psychological trauma'" in the event of a change of custody from the aunt to the father.
B. Post-Trial Motions
On April 5, 2023, the AFC moved, by order to show cause, for an order pursuant to CPLR § 4404[b] setting aside the Decision and Order After Trial, restoring the matter to the trial calendar, and either granting a new trial or reopening the extraordinary circumstances hearing to permit introduction of evidence regarding new developments since the court issued its final order, and to permit introduction of evidence that was not presented at the trial due to the child's refusal to waive her therapist-patient privilege with respect to her ongoing mental health treatment. Alternatively, the AFC sought an order, pursuant to CPLR § 5015(a)(2), vacating the dismissal order based on newly discovered evidence. As interim relief, the AFC sought a stay of the dismissal of the maternal aunt's petition.
According to the AFC, the maternal aunt told the child that she had to leave her home in New York and move to the Washington, D.C. area to reside with her father. Upon learning this information, the child became distressed and experienced anxiety attacks. According to the AFC, on April 3, 2023, the aunt found the child in the bathroom vomiting uncontrollably. The child told the maternal aunt that she searched online for ways to kill herself because she did not want to live with the father and that she wanted to be with her mother in heaven. The child was admitted to New York Presbyterian Hospital. The AFC reported that she interviewed the maternal aunt, a hospital social worker, the child's therapist, and an adult cousin of the child, and that based on these interviews it was evident that the child was experiencing extreme anxiety at the prospect of moving from her aunt's home in New York to live with her father in the Washington, D.C. area.
Additionally, the AFC affirmed that the hospital social worker reported that she had spoken to the father about the child's condition, and that the father believed the incident was a ploy by the aunt to keep custody of the child. The hospital social worker allegedly told the AFC that "unless the father consented to continued hospitalization, the hospital would have to seek involvement by ACS and . . . hold [the child] involuntarily."
In her motion, the AFC sought to reopen the trial so that she could present new evidence to "prove that [the child] is so bonded with the aunt, and that her level of grief at the mother's death and lack of connection with the father is such that removing [the child] from the aunt's care and allowing the father to take custody of her at this time, without even a transition period, would 'threaten the destruction of the child'" (see Bennett v Jeffreys, 40 NY2d 543, 550 [1976]).
By order, dated April 5, 2023, the Family Court (Gliedman, J.) granted the AFC's ex parte requests for interim relief, including a direction that the child remain in the temporary custody of the maternal aunt. At the same time, the court issued an order, pursuant to Family Court Act § [*5]1034, directing the Administration for Child Services (ACS) to investigate allegations that the child experienced panic attacks and attempted suicide following the maternal aunt's revelation of the case outcome. ACS was directed to interview the parties, the child's medical providers, and to report on the child's treatment plan and whether there was a safety plan in place. On May 3, 2023, ACS issued its report.
On May 8, 2023, the Family Court (Friederwitzer, J.) directed that neither the maternal aunt nor the father was to discuss with the child the possibility of the child moving. The court also ordered that the name of the child's therapist be disclosed to the father for purposes of arranging therapy sessions with the child, father, and aunt.
On May 9, 2023, the AFC moved for an order requesting that the court so-order subpoenas for the AFC to obtain hospital, therapy, and school counseling records for the subject child, and finding that such records are "necessary to the appropriate resolution of this case."
The father opposed the AFC's motion to set aside the Decision and Order After Trial. The father filed an affidavit in which he argued that the claim that the child threatened to kill herself was based upon unsubstantiated hearsay statements. He argued that, regardless of whether the child did what was claimed, that it was the aunt and her family members who have "completely ruined a once flourishing, healthy, positive relationship that we have had for years, and that they have poisoned her to such a degree that she needs to be kept away from these people unless supervised." The father also stated that he believed his daughter needed counseling and asserted that he was "ready and able to enroll her in the same immediately after she is rightfully returned" to him.
By order, dated May 22, 2023, the Family Court (Friederwitzer, J.) denied both AFC's post-trial motions in their entirety.
III. The Subject Proceeding
On May 18, 2023, the maternal aunt filed a second petition against the father seeking an order of custody. The petition summarizes the prior history including that on May 25, 2021, the aunt filed a prior petition against the child's father seeking custody, which was dismissed by order dated March 30, 2023, for lack of standing.
In her new petition, the maternal aunt alleges that there has been a "dramatic change of circumstances which necessitates the filing of the instant petition." In this regard, she alleges that the child attempted suicide by ingesting pills after learning that she will no longer be living with her and that the father planned to come to New York on April 9, 2023, to take the child to live with him in Washington, D.C. The child was hospitalized where she was diagnosed with unspecified depressive disorder, unspecified anxiety disorder, bereavement, and post-traumatic stress disorder. The petition alleges that "upon information and belief" the child "was not able to agree that she would not make another attempt to harm herself if she is released to the care of her father." The petition asserts that it would be in the child's best interest for the petitioner to have custody of the child because the child has been totally acclimated to life in New York, that the child wishes to remain with the petitioner in New York, that the child does not want to live with the father, that the father has never been a primary caretaker, that the child has never slept overnight at the father's home, and the child has no or little relationship with the father or his fiancé.
Thereafter, by order dated May 22, 2023, the Family Court (Friederwitzer, J.) ordered that [*6]the child remains living with the aunt until further order of the court and directed, by separate orders dated May 22, 2023, and June 26, 2023, that the father have therapeutic visitation with the child. Those orders have continued to date.
The AFC moved for an order directing a forensic evaluation of the parties and the child. The father moved for an order to compel the aunt to respond to a demand for production and a bill of particulars, and separately moved for an order, inter alia, directing that the aunt be held financially responsible for the costs and fees of the therapeutic supervisor.[FN2]

A. The Father's Motion for Summary Judgment
The father now moves, pursuant to CPLR § 3212, for an order granting him summary judgment dismissal of the aunt's custody petition. The father relies upon the factual findings and legal determinations from the prior proceeding, and the allegations set forth in the aunt's second custody petition. The father contends that the events occurring after the dismissal order, including the child's act of self-harm, do not amount to extraordinary circumstances to overcome the father's superior right to seek custody.
In opposition to the father's motion, the aunt argues, inter alia, that, given the unique set of facts and circumstances regarding the child's mental health and risk of suicide, the court should focus on the child's best interest rather than blindly applying legal rules. The aunt contends that the court should exercise its powers to protect the child from injury and mistreatment and should award the aunt custody to safeguard the child's physical, mental and emotional well-being.
The AFC asserts that the father' contentions are not appropriately made in a summary judgment motion under CPLR § 3212, and that, in any event, the court should conduct a second hearing to determine whether the aunt and the AFC can prove extraordinary circumstances warranting a finding that the aunt has standing to seek custody. The AFC submits, inter alia, a copy of the child's hospital records and, in effect, requests that she be excused from the requirement that such records be submitted in admissible form. She argues that these records support the allegations in the aunt's second petition including that the child experienced extreme distress, suicidal ideations and behavior upon learning the outcome of the first proceeding, and that the child's psychological trauma is sufficient to raise a triable issue of fact regarding the maternal aunt's standing. The AFC contends that extraordinary circumstances may be found even in the absence of evidence of the father's fault, and notwithstanding that the aunt's failure to facilitate the father's relationship with the child. She also contends that the child's strong wishes, in themselves, constitute extraordinary circumstances that may warrant a finding that the aunt has standing.
IV. Analysis
"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Winegrad v New York Univ. Med. Center, 64 NY2d 851, 853 [1985]). "Once this showing has been made, however, the burden shifts to the party opposing the motion for summary judgment to produce [*7]evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Alvarez v Prospect Hosp., 68 NY2d at 574; Winegrad v New York Univ. Med. Center, 64 NY2d at 853). "The rule with respect to defeating a motion for summary judgment, however, is more flexible, for the opposing party, as contrasted with the movant, may be permitted to demonstrate acceptable excuse for his [or her] failure to meet the strict requirement of tender in admissible form" (Zuckerman v City of New York, 49 NY2d 557, 597-598 [1980]).
Initially, contrary to the position of the AFC, the father's motion is appropriately made under CPLR 3212 as opposed to CPLR 3211(a)(7). By submitting the record of the prior proceeding, the father is not merely testing the sufficiency of the allegations contained in the aunt's second petition but is asking the court to consider the record of the prior proceeding in addition to the allegations in the new petition to determine whether there exists any triable issue of fact (see Tenzer v Greenblatt, Fallon & Kaplan v Capri Jewelry, 128 AD2d 467 [1st Dept 1987]). Essentially, he is arguing that the events that occurred after the dismissal of the maternal aunt's first petition are not a sufficient change of circumstances to warrant a second full evidentiary hearing on the issue of the aunt's standing (see Matter of Newton v McFarlane, 174 AD3d 67, 68 [2d Dept 2019]). The father acknowledges that, for purposes of his summary judgment motion, the allegations in the second petition must be taken as true and that all inferences must be resolved in favor of the maternal aunt.
Given that there has already been a full hearing and determination on the issue of the aunt's standing to seek custody of the child, this Court must first determine whether the aunt, in her petition and in response to the father's summary judgment motion, has articulated an appropriate basis for continued judicial intervention. In considering the aunt's request for a second evidentiary hearing, the court bears in mind that a second contested custody hearing can, itself, "create trauma and uncertainty for the child, as well as trauma, uncertainty, and expense for the [litigants]" (Matter of Newton v McFarlane, 174 AD3d 67, at 76).
"Absent extraordinary circumstances, narrowly categorized, it not within the power of a court, or, by delegation of the Legislature or court, a social agency, to make significant decisions concerning the custody of children, merely because it could make a better decision or disposition. The State is parens patriae and always has been, but it has not displaced the parent in right or responsibility" (Matter of Bennett v Jeffreys, 40 NY2d at 545 [emphasis added]). Under existing constitutional principles, the courts are "powerless to supplant parents except for grievous cause or necessity," which may include, for example, "fault or omission by the parent seriously affecting the welfare of a child, the preservation of the child's freedom from serious physical harm, illness or death, or the child's right to an education, and the like" (Matter of Bennett v Jeffreys, 40 NY2d at 545; see Troxel v Granville, 530 US 57 [2000]; Stanley v Illinois, 406 US 645, 651 [1972]).
In the seminal case Matter of Bennett, the Court of Appeals created a two-pronged inquiry for determining whether a nonparent may obtain custody as against a parent (see Matter of Suarez v Williams, 26 NY3d 440, 446 [2015]). First, the nonparent must prove the existence of extraordinary circumstances such as surrender, abandonment, persisting neglect, unfitness, and unfortunate or involuntary disruption of custody over an extended period of time, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the [*8]child (Matter of Suarez v Williams, 26 NY3d at 446 [internal quotation marks and citations omitted]; Matter of Bennett v Jeffreys, 40 NY2d at 544-546). "If extraordinary circumstances are established such that the non-parent has standing to seek custody, the court must make an award of custody based on the best interest of the child" (Matter of Suarez v Williams, 26 NY3d at 446, citing Matter of Bennett v Jeffreys, 40 NY2d at 548; see Matter of Gonzalez v Pagan, 178 AD3d 1039, 1039 [2d Dept 2019]; Matter of Canabush v Wancewicz, 193 AD2d 260, 263 [3d Dept 1993]).
Critically, in Matter of Bennett, the Court recognized that "a child may be so long in the custody of the nonparent, even though there has been no abandonment or persisting neglect by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child" (Matter of Bennett v Jeffreys, 40 NY2d at 550). Even so, such a "situation would offer no opportunity for the court, under the guise of determining the best interest of the child, to weigh the material advantages offered by the adverse parties" (id.) The opinion in Matter of Bennett is not clear whether the "psychological trauma of removal" is considered an "extraordinary circumstance" under the first prong to establish a nonparent's standing, or whether it is a factor to be considered in the second prong on the child's best interests. Either way, the Court's discussion of "the psychological trauma of removal" is limited to situations where the child had been "so long in the custody of the nonparent." In other words, it was presumed that the "psychological trauma" derived from breaking the psychological bond developed over time between the nonparent and the child, as opposed to other potential reasons for the psychological trauma.
In Matter of Adoption L. (61 NY2d 420 [1984]), the Court of Appeals clarified and reiterated the principle " 'the child may be so long in the custody of the nonparent that separation from the natural parent amounts to an extraordinary circumstance, especially when 'the psychological trauma of removal is grave enough to threaten destruction of the child'" (id.[emphasis added], quoting Matter of Bennett v Jeffreys, 40 NY2d at 550). But, in that case, the Court of Appeals made clear that "when the separation between the natural parent and child is not in any way attributable to a lack of interest or concern for the parental role, that separation does not amount to an extraordinary circumstance and, indeed, deserves little significance" (Matter of Adoption L., 61 NY2d at 429; see Matter of Guzzey v Titus, 220 AD2d 976, 977 [3d Dept 1995]). The Court stressed that "courts may not deny the natural parent's persistent demands for custody simply because it took so long" (Matter of Adoption L., 61 NY2d at 429 [internal quotation marks and citations omitted]; see Dickson v Lascaris, 53 NY2d 204, 210 [1981]; Matter of Sanjivini K., 42 NY2d 374, 382 [1979]).
Moreover, the Court of Appeals cautioned that the "resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient. Yet, even then, circumstances may require that, in the best interest of the child, the unlawful acts be blinked" (Matter of Bennett v Jeffreys, 40 NY2d at 550; see Matter of Adoption L., 61 NY2d at 429-430). The Court of Appeals rejected the notion that "third-party custodians may acquire some sort of squatter's rights in another's child. Third-party custodians acquire 'rights'—really the opportunity to be heard—only derivatively by virtue of the child's best interests being considered, a consideration which arises [*9]only after, as the cases have always held, the parent's rights are responsibilities have been displaced" (Matter of Bennett v Jeffreys, 40 NY2d at 552, fn. 2).
Here, considering the record of the prior proceeding and accepting the maternal aunt's and AFC's allegations as true, the child became distressed and attempted suicide upon being informed that, because of the court's determination in the prior proceeding, she must leave New York and live with her father in Maryland. In her post-trial motion, the AFC reported that the child explained to the aunt that she attempted to kill herself to join her deceased mother in heaven, and because she did not want to move from New York to live with her father. Even assuming that the aunt's allegations are true, a significant cause of the child's psychological trauma is her continuing grief following the death of her mother. Indeed, the Family Court (Friederwitzer, J.) found that that by precipitously transporting the child from Maryland to New York within days of the mother's death, the aunt exacerbated an already-traumatic situation for the child and deprived the child of the opportunity to grieve her mother's loss in Maryland with her only remaining parent.
Notably, the child's alleged psychological trauma and suicide attempt occurred while the child was under the care and custody of the maternal aunt in New York. The father's alleged insistence—in the aftermath of the dismissal of maternal aunt's prior petition—that the child be returned to him does not evince a lack of interest or concern for the parental role, but in fact just the opposite. In retrospect, as suggested by the AFC in her motion papers, the father should have developed a transition plan in consultation with the child's mental health providers, the AFC and the aunt. Even so, the subsequent events do not change the facts, as found by the Family Court (Friederwitzer, J.), that the maternal aunt, in effect, took custody of the child without the father's permission and in derogation of the father's parental rights, and that the father has been persistent in his attempts to obtain custody ever since (see Tyrell v Tyrell, 67 AD2d 247 [4th Dept 1979] [no extraordinary circumstances found where parent never acquiesced in custody by nonparent stepmother and promptly commenced proceeding against nonparent upon death of the child's other parent]).
There is no question that the child's bond with the maternal aunt has grown stronger over the pendency of this litigation, and that the child's bond with her father, which had been a positive one prior to the aunt's actions, has been strained. Even so, the strong bond formed between the aunt and the child is not a sufficient reason to displace the father's parental rights. To hold otherwise would defy the warning by the Court of Appeals that nonparents do not acquire "squatter's rights" to another person's child (Matter of Bennett v Jeffreys, 40 NY2d at 552, fn. 2; see also Matter of Adoption of L, 61 NY2d at 429 [courts may not deny the natural parent's "persistent demands for custody simply because it took so long"] ). Thus, the father, who has persistently been demanding that the aunt return his child since the aunt first removed her from Maryland, established prima facie entitlement to summary judgment (see Matter of Thompson v Bray, 148 AD3d 1364 [3d Dept 2017] Matter of Burghdurf v Rogers, 233 AD2d 713 [3d Dept 1998]; Matter of Titus v Guzzey, 244 AD2d 684, 686-687 ["Assuming, arguendo, that (the child) has suffered some degree of emotional trauma as a natural consequence of the separation (from the nonparent), we nonetheless conclude that the record is devoid of any proof of neglect, abuse or unfitness on (the parent's) part, thereby precluding a finding of extraordinary circumstances"]).
The maternal aunt and the AFC fail to demonstrate the existence of a triable issue of fact [*10]on the issue of the aunt's standing. The maternal aunt does not submit any evidence in opposition to the motion, and, in effect, relied upon the same documentation that was submitted by the father. The AFC submitted uncertified copies of the hospital records, to the effect that they document and support the allegations contained in the petition. Even excusing that the records were not submitted in admissible form (see Zuckerman v City of New York, 49 NY2d at 597-598), they nonetheless, for the reasons stated above, do not raise a triable issue of fact on the aunt's standing.
The cases relied upon by the AFC in support of her argument that this Court should conduct a second hearing are inapplicable. For example, although Matter of P.T. v T.R (2004 NY Slip Op. 51000[U] [Fam Ct, Orange County 2004), has some factual similarities to this case, it is distinguishable because, unlike this case, there had never been a full hearing and determination on the nonparent's custody petition. The case Matter of Michael B. (80 NY2d 299 [1993]) did not involve a custody proceeding between a nonparent and a parent, but rather a "best interest" inquiry under Social Services Law § 392, and therefore is not applicable to the facts of this case. In Matter of Curry v Ashby (129 AD2d 310 [1st Dept 1987]), the First Department held that there may be facts establishing extraordinary circumstances in the absence of culpable conduct on the part of the parent. However, it is distinguishable on the facts because, in contrast to this case, the nonparent did not acquire custody of the child through impermissible means.
The rule that nonparents must prove extraordinary circumstances before the court reaches the issue of the child's best interests may lead to outcomes that cause psychological trauma to the child and may not actually be in the child's best interest. For example, in Matter of Adoption of L., the Court of Appeals, applying its precedent in Matter of Bennett, determined that then 4-year-old child had to be removed from the custody of the nonparents and given to the birth mother. The nonparents had raised the child from birth and were described as "exemplary parents," and the child's birth mother, who had not seen the child since the time of birth, was described as being "poor, unwed, and an illegal alien who speaks little English and has no settled plans for the child's and her own future" (Matter of Adoption L., 61 NY2d at 423; see Matter of Thompson v Bray, 148 AD3d 1364 [3d Dept 2017] [significant psychological bond with nonparent and period of no contact with parent did not amount to extraordinary circumstances]; Matter of Burghdurf v Rogers, 256 AD2d 1023 [3d Dept 1998]; Matter of Titus v Guzzey, 244 AD2d 684 [3d Dept 1997]). While this court is concerned about the potential for the child to suffer additional psychological trauma, it is constrained by the law in this area. Accordingly, the father's motion for summary judgment dismissal of the aunt's petition is granted.
The court would be remiss if it did not address the allegation that the child attempted suicide after learning that the aunt's first custody petition was dismissed, notwithstanding that such allegations were not presented in admissible form. It is with the child's mental health and physical wellbeing in mind that this Court therefore stays its own order for a period of thirty days. This Court hereby directs that counsel and the parties appear for a conference prior to the order going into effect on March 18, 2024. Further, this period will ensure that the father has the most up-to-date information regarding the child's mental health from her direct care providers, which shall be used by the father to guide his actions. Were the father to act in a way that places the child at imminent risk of impairment of emotional health or condition, those actions may be subject to State scrutiny and interference (Family Court Act § 1012[f][i][A] [defining a [*11]"neglected child" as one whose "physical, mental or emotional condition . . . is in imminent danger of becoming impaired as a result of (her) parent . . . to exercise a minimum degree of care in supplying the child with adequate . . . medical . . . care, though financially able to do so"]; Family Court Act § 1012[h] [including "self-destructive impulses" within definition of conduct that may constitute "impairment of mental or emotional condition"]; Family Court Act § 1027[a][3][providing, inter alia, that the AFC may apply for an order to determine whether the child's interests require protection]; Matter of Hofbauer, 47 NY2d 648 [1979]).
Accordingly, the Court's decision is stayed until March 18, 2024. The parties are directed to appear for a virtual court conference on or before March 15, 2024 in part 9a, with the conference date to be selected with the court attorney.
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.
Dated: February 16, 2024
Hon. Robert A. Markoff

Footnotes

Footnote 1: The Maryland custody proceeding was dismissed for reasons unknown to this Court. Given the undisputed facts regarding the child's residence, Maryland was the child's home state under Domestic Relations Law § 75-a(7), and, therefore, had jurisdiction to determine initial custody under Domestic Relations Law § 76. However, since both the New York and Maryland proceedings are concluded, the issue of which court had subject matter jurisdiction in those prior proceedings is now academic. Further, it should be noted that the father's paternity was established in the New York proceedings.

Footnote 2: The father's motion for a bill of particulars was denied, and the other motions are held in abeyance pending determination of the instant summary judgment motion.